IN THE UNITED STATED DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD MCDONALD | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Civil Action No. 09-442 |
| v. | ) | Judge Terrence F. McVerry |
| | ) | |
| PENNSYLVANIA STATE POLICE; | ) | |
| COLONEL FRANK PAWLOWSKI | ) | |
| | ) | |
| | ) | |
| Defendants | ) | Electronically filed |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I. STATEMENT OF THE CASE

Plaintiff brings suit pursuant "to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 (*See* Complaint, ¶ 1). Plaintiff also brought a procedural due process claim against Defendant Gallaher (*Id.,* ¶¶ 43-46).

Specifically, Plaintiff faults the Defendants, and more specifically the Municipal Police Officer Training and Education Commission (MPOTEC) with denying him Act 120 certification "because of a disability and/or perceived disability premised solely upon the fact that [he] was taking lawfully prescribed pain medications." *(Id.,* ¶ 1). Plaintiff had "injuries to his neck and back and a disc herniation" due to a work related injury at an earlier employer (*Id.,* ¶ 14). His doctors prescribed the narcotic Avinza to ease his pain.[1]

---

[1] Avinza " is a long acting oral form of morphine. The side effects of this drug are legion…including somnolence, GI upset, edema, rash, insomnia, numbness, anorexia, depression, dyspnea, orthostatic hypotension, and euphoria. If a member of the [Pennsylvania State Police] were to take this drug for a legitimate reason they would be excluded from any

1

This Honorable Court granted the Defendants' motion for summary judgment (*See* Doc. # 61). At the summary judgment stage, this Court decided this matter on Title I of the ADA finding in favor of the Defendants. This Court decided not to address the Title II or sovereign immunity arguments the Defendants had advanced in their motion for summary judgment.

After the Defendants vigorously defended the granting of summary judgment to the 3rd Circuit, the Appellate Court reversed in part stating that Plaintiff had "assert[ed] his claim under Title II of the ADA…It was error, therefore, to resolve [Plaintiff's] disability discrimination claims on the basis that the defendants are not 'covered entities' within the meaning if Title I." *Richard McDonald v. Pennsylvania State Police, et.al.,* Case No. 11-1867, p. 6.[2]

At both the summary judgment and appellate stages the Defendants raised Title II and sovereign immunity defenses. This Honorable Court saw no need to address these claims and the 3rd Circuit declined to address these claims holding that these Title II "defenses to McDonald's disability discrimination claims…are best resolved in the first instance by the District Court on remand." *Richard McDonald v. Pennsylvania State Police, et.al.,* Case No. 11-1867, p. 6. (footnote omitted).

In the footnote that follows this holding, the 3rd Circuit further noted that the United States had "intervened in th[e] appeal to defend the constitutionality of 42 U.S.C. § 12202, which abrogates State's sovereign immunity for claims brought under Title II of the ADA. As the United States argues, however, it is inappropriate to reach this constitutional issue unless and

---

critical duty and placed on medically limited duty until such time as they no longer used this drug." (Statement of Material Facts, ¶ 1)(Hereinafter "SMF")

[2] The 3rd Circuit affirmed this Court's granting of summary judgment on the due process claim.

until it is decided that McDonald has made out a distinct Title II claim." *Richard McDonald v. Pennsylvania State Police, et.al.,* Case No. 11-1867, p. 6, n. 1 (Citation omitted).

The 3rd Circuit remanded this case for this Honorable Court to address the Title II and sovereign immunity arguments advanced at the summary judgment stage so that the Court could "resolve[ ] in the first instance" whether Plaintiff has even "made out a distinct Title II claim." Consistent with the Circuit Court's ruling, this Court permitted the parties to "supplement the briefings on the Title II and sovereign immunity" issues (*See* Doc. # 67). This Defendants' supplement follows.

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) reads in pertinent part that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "The moving party [on a Motion for Summary Judgment] has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable fact finder could only find for the moving party." *Watson v. Eastman Kodak Co.,* 235 F.3d 851, 854 (3d Cir. 2000). Rule 56 does not allow the non-moving party to rely merely upon bare assertions, conclusory allegations or suspicion. *See Fireman's Insurance Company of Newark v. DeFresne,* 676 F.2d 965, 969 (3d Cir. 1982). Instead, "'[o]nice the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable fact finder could rule in its favor.'" *Azure v. Chase Bank, USA, Nat. Assn.,* __F.3d__, 2010 WL 1236328 * 3

(3rd Cir. 2010) *quoting Ridgewood Bd. of Educ. v. N.E. extra M.E.,* 172 F.3d 238, 252 (3rd Cir. 1999).

### III. ARGUMENT

#### A. Title II did not validly abrogate 11th Amendment immunity for a claim like Plaintiff's based on the denial of a professional license.

The Defendants direct this Court's attention to the immunity arguments they made in their original motion for summary judgment (*See* Doc. # 47, pp. 2-6). The Defendants offer the following supplemental arguments.

Title II of the ADA does not validly abrogate the Eleventh Amendment immunity the Commissioner enjoys in his official capacity for claims challenging professional licensing, like MPOETC's decision here to refuse to certify Mr. McDonald for employment as a municipal police officer. While such state immunity from the provisions of a federal law may be validly abrogated under Section 5 of the Fourteenth Amendment by an appropriate exercise of Congressional power, with respect to review of state professional licensing decisions under Title II of the ADA that is not the case.

In *Tennessee v. Lane*, 541 U.S. 509 (2004) the Supreme Court does not hold that Title II of the ADA abrogated 11th amendment immunity wholesale for <u>all</u> forms of public services. Only those public services for which a historical pattern of disability discrimination was before Congress when enacting the ADA are subject to Title II, in the absence of the violation of separate constitutional rights of the disabled person in the provision of public services. *U.S. v. Georgia*, 546 U.S. 151 (2006) is <u>only</u> capable of being read as consistent with this view of the law. Since there is no such historical evidence of disability discrimination Title II is not abrogated for professional licensing. *Roe v. Johnson*, 334 F. Supp. 2d 415 (S.D.N.Y. 2004).

4

The Equal Protection Clause of the Fourteenth Amendment does not apply to the disabled so as to subject state laws applicable to them to the test of "strict scrutiny" on the basis that they comprise a "suspect" class, but merely requires that state laws to which they are subject must have a rational basis. *Bd. of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 367 (2001). The power conferred upon Congress under Section 5 of the 14th Amendment to enforce its guarantees "includes the authority both to remedy and to deter violation of rights guaranteed by the Fourteenth Amendment by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). It does not give Congress the power, however, to define authoritatively the substantive meaning of the Fourteenth Amendment, which remains the province of the courts. *Id.*, at 520; *Kimel v. Florida Bd. Of Regents*, 528 U.S. 62, 81 (2000). Thus, "in order to authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation." *Garrett, supra*, at 374.

Using this test, the Supreme Court in *Garrett* held that Title I of the ADA is an invalid exercise of congressional power under Section 5 to the extent it prohibits discrimination against the disabled in contemporary State employment. *Id.*, 374. Simply put, there is no history for it. Congress in enacting the ADA did not develop a record adequate to show that the states had engaged in a past pattern and practice of discriminating against the disabled in state employment. *Id.*, at 370.

The Court in *Lane*, however, found that Title II of the ADA is a valid exercise of the power, as applied to cases implicating a disabled person's right of access to the courts. *Lane,*

*supra,* 541 U.S. at 533 – 534. This rests on two reasons. First, unlike in *Garrett*, the legislative record for the ADA documented a relevant history of discrimination against the disabled in access to court houses and court proceedings. *Id*., 527. Second, the individual right of access to the courts in this aspect is a distinct constitutional right on its own that is grounded in the Confrontation Clause and the 14th Amendment's due process clause; as such a basic constitutional right in an independent sense and in its own right, it may also be duly enforced by Title II, insofar as its infringement is already subject to more searching judicial review in any case, *Id*., at 522 – 523. *Cf., Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 733 – 737 (2003) as cited in *Lane, supra*, 541 U.S. at 529 (because the FMLA is targeted at sex-based classifications that are subject to heightened judicial scrutiny in the first place "it was easier for Congress to show a pattern of State constitutional violations" than in *Garrett*).

With respect to the existence of the necessary record, the *Lane* Court pointed to state laws, the decisions of the Supreme Court itself, and other evidence developed in Congressional hearings showing a historical pattern of disability discrimination in voting, marriage, jury service, involuntary commitment, abuse and neglect of patients in State mental hospitals, zoning decisions, the penal system, the administration of justice in general and public education. *Id.,* at 525 – 526. Nevertheless, Defendants submit that *Lane* cannot be read to validate any, or all challenges brought under Title II of the ADA to the provision of public services under Section 5 of the 14th amendment, but only those that either independently implicate the violation of a putatively disabled plaintiff's constitutional rights, or for which there is a record or a pattern of discrimination toward the disabled in the provision of the particular public service in general in the legislative history of the ADA. Definitely *Lane* did not hold that Title II of the ADA was a valid abrogation of Eleventh Amendment immunity as applied to all public services: "Whatever

might be said about Title II's other applications, the question presented in this case is not whether Congress can validly subject the states to private suits for money damages for failing to provide reasonable access [to seating at state-owned] hockey rinks, or even voting booths, but whether Congress had the power under § 5 to enforce the constitutional right of access to the courts." *Id.*, at 530 – 531. Not only did the Court in *Lane* find valid abrogation on the grounds of disability discrimination regarding physical access to the court room that violated the constitutional rights of class plaintiffs independently, but it also found "[w]ith respect to the particular services at issue in this case, Congress learned that many individuals, in many States across the country, were being excluded from court houses and court proceedings because of their disabilities. *Id.*, 527.

Had the *Lane* court comprehensively and authoritatively validated Title II as a proper abrogation of the 11th amendment broadly for all state public services challenged under its terms, regardless of their specific nature, why did the Supreme Court not simply just say so in *U.S. v. Georgia*, 546 U.S. 151 (2006)? After all there were earlier cases of the Courts of Appeal that had held this to be the case in the same prison context that was presented in *Georgia*, such as *Miller v. King*, 384 F.3d 1248 (11th Cir. 2004) and the 3rd Circuit's holding in *Cochran v. Pinchak*, 401 F.3d 184, 191 (3d Cir. 2005), *vacated*, 412 F.3d 500 (3d Cir. 2005) (that cites and relies upon this specific holding by the *Miller* court presuming to simplistically interpret *Lane* in this very fashion, ("Like the Eleventh Circuit in *Miller*, '*Lane* considered evidence of disability discrimination in the administration of public services generally, rather than focusing only on discrimination in the context of access to the courts, and concluded that Title II in its entity satisfies *Boerne*'s step-two requirement that it be enacted in response to a history and pattern of state constitutional violations. We are bound to that conclusion as to step-two.'"); *See also*,

*Constantine v. Rectors and Visitors of George Mason University*, 411 F.3d 474, 487 and n. 9 (4th Cir. 2005) (*dicta*, specifically citing and relying on *Miller* and *Cochran* for the general proposition Title II abrogates Eleventh Amendment immunity but doing so in the context of a public education case and therefore also holding that the *Lane* Court specifically identified public education as one of a number of public services in which there was a documented pattern of disability discrimination in the congressional record).[3] Yet the Supreme Court in *Georgia* did not do this.

Instead the Supreme Court in *Georgia* articulated a structured tripartite test for addressing whether Title II abrogated Eleventh Amendment immunity regarding alleged disability discrimination by the specific public service at issue: "(1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such misconduct also violated the Fourteenth Amendment; and insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, determine whether Congress purported abrogation of sovereign immunity as to that class of conduct." *Bowers v. NCAA*, 475 F.3d 524, 553 (3d Cir. 2007) citing *U.S. v. Georgia, supra*, 546 U.S. 151, 126 S.C. 877, 882 (emphasis supplied).[4] If *Lane* in fact had decided that all State public services have an adequately documented history of disability

---

[3] Notwithstanding *Miller's* and *Cochran's* "take" on the meaning of *Lane*, the Court there noted that there actually was a legislative record for a pattern of disability discrimination in state prisons before Congress when it enacted Title II of the ADA.
    Moreover, Judge (now chief judge) Scirica's dissenting opinion in *Cochran v Pinchak* rejects the majority's broad reading of *Lane* in this regard in favor of the narrow understanding that Defendants suggest is the correct one. When utilized, however, this approach still results in reaching the conclusion that there is an ample historical record of a pattern of discrimination against the disabled in state prisons, although it is reached inductively on the basis of pertinent evidence demonstrating the point and not the product of *a priori* reasoning from a fixed premise of questioned or debatable validity. *Cochran, supra*, 401 F.3d at 195 – 197.

[4] The *Bowers* Opinion as published only references the corresponding pagination of the Supreme Court Reporter for *U.S. v. Georgia*. The page in the U.S. Reports is 159 on which the test appears.

why is the third prong even necessary or least as stated so broadly? If so why wouldn't it simply be directed to the question of whether the remedy was congruent and proportional under *City of Boerne v. Flores*, 521 U.S. 507 (1997) since the fact there is the necessary history of disability discrimination must be taken for granted whenever the State's provision of public services or programs is involved?

The *Georgia* case itself was decided (to the extent it was) by the Supreme Court on the grounds that the prisoner's specific allegations of disability discrimination in that case violated the 8th amendment and thus transgressed the 14th amendment, thereby plainly ensuring Title II validly abrogated 11th amendment immunity as to them without much difficulty and requiring the reinstatement of his complaint as to them. The Court, however, effectively remanded those other claims for analysis by the district court on the basis of the third prong of its announced test "on a claim by claim basis." *Id*., 159. Why do so in these open-ended terms if it had been previously determined in *Lane* conclusively that there is a historical pattern of disability discrimination in the provision of all state services or programs? The terms of the language of the Court's mandate don't fit with the concept that the existence of a historical pattern of disability discrimination is such a foregone conclusion, even in a penal context, when state services or programs are concerned, so that the demonstration of pertinent evidence of a pattern and practice of discrimination is not required to be demonstrated.

Therefore, Defendants read the opinion in *Bowers* as being consistent with this understanding of the law. *Bowers, supra*, 475 F3d. at 554, n.35. That is, to the extent that it cites to the pre-*Georgia* cases, this Court's previously vacated opinion in *Cochran v. Pinchak* and the Fourth Circuit's opinion in *Constantine*, and states that the second prong of the *Boerne* test was conclusively established with respect to Title II by the *Lane* Court, it is necessarily to be

9

regarded as an errant *dictum*, like the similar statement in *Constantine*: as in *Constantine*, the *Bowers* Court's true and accurate actual holding must be that the second prong of the *Boerne* test for Title II is satisfied by a narrow, as applied inquiry regarding disability discrimination in the particular area of public education. *Id*. The Court's citation to the specific holding of the First Circuit in *Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006) that focuses the entire second prong of the *Boerne* test on the area of public education makes this manifest. "[T]he sounder approach is to focus the entire *City of Boerne* test on the particular category of state conduct at issue." *Toledo, supra* at 35.

Defendants submit that this case is unlike *Lane*, *Bowers* or even *Cochran* or any of the cases from other Courts of Appeal that have been discussed: in each of them, whatever else is said in the opinion, plainly and indisputably there was historical evidence of a pattern of disability discrimination in the particular area of state conduct at issue in the record before Congress when the ADA was enacted. That is not true here.

On the contrary, Congress has not developed a legislative record of discrimination in the issuance or suspension of professional licenses by the states. In *Roe v. Johnson*, 334 F.Supp.2d 415 (S.D.N.Y. 2004), the Court carefully considered the legislative history of the ADA and found no findings related to professional licenses:

> The legislative record for the ADA does not include any findings documenting a pattern of state discrimination in the admission of attorneys to the bar, or more generally in the granting of licenses to professionals. See 42 U.S.C. § 12101; S.Rep. No. 101-116 (1989); H.R.Rep. No. 101-145 pts. 1, 2, 3 & 4 (1990), reprinted in 1990 U.S.C.C.A.N. 267; H.R. Conf. Rep. 101-558 (1990); H.R. conf. Rep. No. 101-596 (1990), reprinted in 1990 U.S.C.C.A.N. 565. Professional licensing is mentioned in the congressional record only in connection with the portion of Title III addressing the accessibility of test sites and the provision of accommodations with respect to testing

> conditions. See, e.g., H.R. Conf., Rep No. 101-485 pt. 3 (1990), 1990 U.S.C.C.A.N. at 491. The specific application of Title II to a state's determination of an applicant's qualification for the bar is far removed from the type of discrimination in the administration of public programs and services that *Lane* found to be supported by the congressional record. *Lane*, 541 U.S. at 526, 124 S.Ct. at 1990. The examples of discrimination discussed in the legislative history – for instance, the inadequate provision of public transportation and access to public facilities – do not support the existence of a pattern of discrimination in licensing that requires preventative or remedial legislation. See, e.g., H.R.Rep. No. 101-485 pt. 2, 1990 U.S.C.C.A.N. at 366-82.

*Id.* at 422-23. *Accord, Brewer v. Wisconsin Board of Bar Examiners*, 270 Fed. Appx. 418, 421 (7th Cir. 2007) (Congress did not identify a history and pattern of discrimination against the disabled in the administration of attorney licenses). Mr. McDonald cannot assert the contrary, especially since these cases follow *Lane* to reach their results.

The Court's Title II analysis in *Mohney v. Pennsylvania*, 809 F.Supp.2d 384 (W.D.Pa. 2011) does nothing to undercut the Defendants' position as *Mohney* is distinguishable in at least two respects. First, the "program, service, or activity" at issue in *Mohney,* an arrest in the narrow sense of that concept or "police encounters with mentally disabled individuals" or police encounters with any citizen in a broader sense, *Id.,* at 397, 398, bears no relationship to the "program, service, or activity" in this case, namely, professional licensure. Secondly, this Court in *Mohney* emphasized that when speaking of "discrimination in the context of encounters between law enforcement personnel and mentally disabled individuals..[this] Court's independent review of the legislative history of the ADA reveals that Congress expressly considered a pattern of such discrimination when it enacted the ADA." *Id.,* at 397. Just the opposite is true in this case. As noted above, there is no pattern or history of discrimination in the issuance or suspension of professional licenses by the states.

Accordingly, Title II, as applied to comparable cases like this one challenging a state's decision to deny municipal police officer certification through the MPOETC, is an invalid exercise of congressional power under Section 5 of the 14th amendment and the ADA claim against the Commissioner in his official capacity is barred by the Eleventh Amendment.

**B. Plaintiff is not "disabled" as that term is defined under the ADA and RA.**

The Defendants direct this Court's attention to the "disability" and "otherwise qualified" arguments they made in their original motion for summary judgment (*See* Doc. # 47, pp. 7-16). The Defendants will not reiterate the points they made in their motion for summary judgment with respect to the "otherwise qualified" prong. They do, however, offer the following additional support for their contention that Plaintiff is not "disabled" under the ADA or RA.

Even if this Court finds that Plaintiff's claims are not barred by the 11th Amendment, Plaintiff must still state a claim under the ADA and RA. *Mohney* is illustrative in this respect. After the Court held that the defendants were not entitled to immunity, it proceeded onto an analysis of the substance of the ADA/RA and concluded "that Plaintiff [had] not sufficiently pled facts to support a plausible claim in [that] case." *Mohney, supra,* at 402. The same is true here.

It is not clear, after Mr. McDonald's deposition, that he claims to have an actual disability in terms of the "significant life activity" of working. Since he is working as an investigator for Travelers Insurance and previously did work for several years as either the police chief or director of operations for the police department of Ellwood City, PA., while taking the drug Avinza for his back pain, there is no true basis for such a claim. His asserted limitations only amount to sitting in a car for an extended period of time, the inability to touch his toes or the ground when bending from the waist, or difficulty in standing in one place for an extended period. He admits they are not particularly significant as compared to their manifestation in the

past. He can bend at the waist, walk, actually handcuff a suspect lying on the ground, lift him up from the ground, or even physically subdue a resisting suspect. He has mobility. Such a person is not actually disabled from working, regardless of what medication he takes.

Nor did the MPOETC regard him as disabled because significantly restricted in working. One must be precluded from a substantial class of jobs, not one particular kind of job. *Williams v. Philadelphia Housing Auth. P.D.*, 380 F.3d 751 (3d Cir. 2004) (officer's inability to carry or have access to guns due to depression precluded him from working in any aspect of law enforcement as a police officer, constituting a broad class of jobs); *Murphy v. UPS*, 527 U.S. 516 (1999) (plaintiff not regarded as disabled because UPS considered him unable to be a "mechanic" in its business, which required him to be able to drive commercial vehicles, rather than to perform a mechanic's job in general, or a broad range of jobs that did not require driving); *Sutton v. United Airlines*, 527 U.S. 471 (1999) (pilots denied employment by airline as global pilots because of their myopia were not regarded as disabled because they could still qualify for work as regional pilots or as flight instructors).

The MPOETC's refusal to certify Mr. McDonald as a municipal police officer, (because he takes Avinza) has no bearing on his qualification for jobs in federal law enforcement, his eligibility for law enforcement jobs with the Office of the Attorney General of Pennsylvania, or his ability to work as a private police officer or detective. He may work as a state park ranger. *Pa State Lodge, F.O.P. v. Com., Dept. of Conservation and Natural Resources*, 909 A.2d 413 (Pa. Cmwlth. 2006), *aff.,* 592 Pa. 304, 924 A.2d 1203. The campus police of the State System of Higher Education are specifically excluded from coverage by the MPOETC by statute. 53 Pa. C.S. § 2162, definitions, "police department." So it cannot be said he is regarded as disabled as a result. *Wilson v. P.S.P.*, 2004 WL 875573 (E.D. Pa.) (vision requirements for candidates to be

13

cadets for the State Police Academy did not mean the class of plaintiffs who were thus disqualified were "regarded as disabled" because they wore corrective lenses); *Joyce v. Suffolk County*, 911 F. Supp. 92 (E.D. N.Y. 1996) (being disqualified for a particular police department because of vision acuity requirements applicable to both eyes does not amount to being "regarded as disabled"); *Papadopoulos v. Modesto P.D.*, 31 F. Supp. 2d 1209 (E.D. Cal. 1998) (collecting cases on the general principle that being found physically incapacitated by a police department from serving in a specific capacity as a police officer in that particular department does not mean one is "regarded as disabled").

Comparable cases involving prescription drug use for health problems that disqualified individuals from particular trucking jobs also serve to support Defendants' position here as well. For example, in *Daugherty v. Sajar Plastics*, 544 F.3d 696 (6th Cir. 2008), the Sixth Circuit rejected a "regarded as" claim involving the potentially dangerous side effects of prescription medications being taken by an employee. Daugherty had worked for Sajar as a maintenance technician. His duties included troubleshooting and repairing all electrical and mechanical equipment, and necessitated use of band saws, overhead cranes and forklifts, etc. 544 F.3d at 699-700. Following a layoff, plaintiff was recalled to work contingent upon a physical examination. During that exam, he disclosed that he was taking increasing does of OxyContin and Duragesic (Fentanyl) for a prior back injury. The doctor retained by Sajar opined that while Daugherty would be able to complete the duties associated with the job description, he (the doctor) did not feel comfortable approving reemployment given the significant medication (both type and strength) taken by plaintiff on a daily basis. The doctor believed that these analgesics could mask symptoms of re-injury, or more importantly, "cause an impairment of perception or judgment which might lead to an injury to himself or others." 544 F.3d at 700-01. Sajar's

14

contracted physician based his opinion on the potential side effects of the medications as cited in the PDR. *Id.*, at 700, 705.

The District Court found, and the Circuit Court agreed, that the employer did not regard Daugherty as unable to perform a class of jobs; at most, it believed Daugherty's back condition and medications precluded him from performing the dangerous machinery functions required of his particular job. Accordingly, Daugherty could not establish a *prima facie* "regarded as "disability claim. 544F.3d at 706.

Likewise, in *EEOC v. JB Hunt*, 321 F.3d 69 (2nd Cir. 2003), job applicants who were denied over-the-road truck driving positions due to their use of medications with potentially harmful side effects were not regarded as disabled. According to the Court in *Hunt*, driving tractor-trailer trucks over long distances is neither a class of jobs not a broad range of jobs, but instead a "specific job with specific requirements . . . especially the ability to stay alert over long hours under difficult conditions. A Hunt OTR driver's alertness cannot flag." 321 F.3d at 75. Thus, Hunt's use of its own hiring criteria to disqualify applicants who were taking certain medications likely to interfere with the ability to safely drive a commercial vehicle simply showed that Hunt regarded these applicants as ineligible for a specific position, not that it regarded them as disabled within the meaning of the ADA. 321 F.3d at 73-78.

PSP Medical Officer Dr. Darby Hand opined that even if other medical professionals think Plaintiff could fulfill the duties of a municipal police officer there is a real questions as to whether Plaintiff "would be able to function in the capacity of a certified municipal police officer who is engaged in the day to day tasks of law enforcement in which coherent, quick and precise decision making is paramount." (SMF ¶ 20). Given that Plaintiff is on Avinza, Hand opined that "there remains a cognitive deficit…the person may well be able to do all of the things that they

need to do…in order to care [for] themselves. I am mightily resistant to the assertion, or belief, that they would be able to respond appropriately in situations that require split second thinking and instantaneous action to protect themselves and the public." (SMF ¶ 21). This testimony fits this case squarely within the holdings of the cases cited above.

WHEREFORE the Defendants respectfully request that their motion for summary judgment be granted.

Respectfully submitted,

**Linda L. Kelly**
Attorney General

/s/ Robert A. Willig
ROBERT A. WILLIG
Senior Deputy Attorney General
Attorney I.D. No. 53581

Office of Attorney General
6th Floor, Manor Complex
564 Forbes Ave.
Pittsburgh, PA 15219
Phone: (412) 565-7680
Fax:    (412) 565-3028

Greg R. Neuhauser
Chief Deputy Attorney General

Date: August 3, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the within **Defendants' Supplemental Brief in Support of Motion for Summary Judgment** was served upon the following via ECF this 3rd day of August, 2012:

Timothy P. O'Brien, Esquire
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

|  |  |
|---|---|
|  | /s/ Robert A. Willig |
|  | ROBERT A. WILLIG |
| Office of Attorney General | Senior Deputy Attorney General |
| 6th Floor, Manor Complex | Attorney I.D. No. 53581 |
| 564 Forbes Ave. |  |
| Pittsburgh, PA 15219 |  |
| Phone: (412) 565-7680 | Susan J. Forney |
| Fax:    (412) 565-3028 | Chief Deputy Attorney General |