No. 11-1867

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

RICHARD MCDONALD,

Plaintiff-Appellant

v.

PENNSYLVANIA STATE POLICE, COLONEL FRANK PAWLOWSKI,
Commissioner of Pennsylvania State Police in his official capacity, MAJOR
JOHN GALLAGHER, in his individual capacity,

Defendants-Appellees
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
_____

BRIEF FOR THE UNITED STATES AS INTERVENOR
_____

THOMAS E. PEREZ
 Assistant Attorney General

JESSICA DUNSAY SILVER
SASHA SAMBERG-CHAMPION
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, DC 20044-4403
 (202) 307-0714

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION..........................................................................1

QUESTION PRESENTED ....................................................................................2

STATEMENT OF THE CASE................................................................................2

SUMMARY OF ARGUMENT ...............................................................................5

ARGUMENT

      I      THIS COURT SHOULD NOT RULE ON THE VALIDITY OF
            TITLE II'S ABROGATION OF SOVEREIGN IMMUNITY
            BEFORE ADDRESSING ISSUES THAT COULD MAKE
            ADJUDICATING THAT QUESTION UNNECCESSARY...............9

      II     TITLE II VALIDLY ABROGATES THE STATES' SOVEREIGN
            IMMUNITY WITH RESPECT TO CLAIMS INVOLVING
            LICENSING ......................................................................13

CONCLUSION .................................................................................................44

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE**

*Association for Disabled Ams., Inc.* v. *Florida Int'l Univ.*,
    405 F.3d 954 (11th Cir. 2005) ...........................................................17, 29, 42

*Baird* v. *State Bar of Ariz.*, 401 U.S. 1 (1971) .........................................................34

*Bartlett* v. *New York State Bd. of Law Exam'rs*, 226 F.3d 69 (2d Cir. 2000) .........27

*Bennett-Nelson* v. *Louisiana Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005) ...........12

*Board of Regents* v. *Roth*, 408 U.S. 564 (1972) .....................................................34

*Board of Trs. of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356 (2001).........................26

*Bowers* v. *NCAA*, 475 F.3d 524 (3d Cir. 2007) ................................................*passim*

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997)..................................................36, 41

*Clark* v. *Virginia Bd. of Bar Exam'rs*, 880 F. Supp. 430 (E.D. Va. 1995) .............28

*Cochran* v. *Pinchak*, 401 F.3d 184 (3d Cir.),
    vacated, 412 F.3d 500 (3d Cir. 2005)...........................................................15

*Commonwealth* v. *Irwin*, 345 Pa. 504 (1942) .........................................................31

*Constantine* v. *Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) .................................................................*passim*

*D'Amico* v. *New York State Bd. of Law Exam'rs*,
    813 F. Supp. 217 (W.D.N.Y. 1993).............................................................27

*Department of Transp.* v. *Clayton*, 546 Pa. 342 (1996) .........................................31

*Disabled in Action of Pa.* v. *SEPTA*, 635 F.3d 87 (2011) ......................................12

*Doe* v. *County of Centre, Pa.*, 242 F.3d 437 (3d Cir. 2001)...................................40

**CASES (continued):**                                                    **PAGE**

*Ellen S.* v. *Florida Bd. of Bar Exam'rs*, 859 F. Supp. 1489
    (S.D. Fla. 1994) ................................................................28

*Fowler* v. *New York State Bd. of Law Exam'rs*,
    885 F. Supp. 66 (W.D.N.Y. 1994).............................................27

*Geen* v. *Foschio*, 94 F.R.D. 177 (W.D.N.Y. 1982) .................................32

*Gurmankin* v. *Costanzo*, 556 F.2d 184 (3d Cir. 1977) ...........................25

*Guttman* v. *Khalsa*, 669 F.3d 1101 (10th Cir. 2012)........................17, 20

*Haas* v. *Quest Recovery Servs., Inc.*, 549 U.S. 1163 (2007) ...................10

*Heumann* v. *Board of Educ.*, 320 F. Supp. 623 (S.D.N.Y. 1970) ..........25

*In re Rubenstein*, 637 A.2d 1131 (Del. 1994)..........................................28

*Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62 (2000)..............................14

*Klingler* v. *Director, Dep't of Revenue*, 455 F.3d 888 (8th Cir. 2006) ..................17

*Lyng* v. *Northwest Indian Cemetery Protective Ass'n*,
    485 U.S. 439 (1988)........................................................11

*McCarthy* v. *Hawkins*, 381 F.3d 407 (5th Cir. 2004) .............................17

*McDonald* v. *Pennsylvania*, 62 F.3d 92 (1995).......................................12

*Medical Soc'y of N.J.* v. *Jacobs*, No. 93-cv-3670,
    1993 WL 413016 (D.N.J. Oct. 5, 1993) .......................................28

*Nevada Dep't of Human Res.* v. *Hibbs*,
    538 U.S. 721 (2003)........................................... 19, 36, 38-39

*Northwest Austin Mun. Util. Dist. No. One* v. *Holder*,
    129 S. Ct. 2504 (2009).........................................................11

**CASES (continued):**                                                    **PAGE**

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) .............................................................41, 43

*Plyler* v. *Doe*, 457 U.S. 202 (1982) ......................................................................42

*Puerto Rico Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*,
 506 U.S. 139 (1993).................................................................................13

*Reynolds* v. *Pennsylvania*, No. 3:09-cv-1492,
 2010 WL 2572798 (M.D. Pa. June 21, 2010) ...............................................20

*Roe* v. *Johnson*, 334 F. Supp. 2d 415 (S.D.N.Y. 2004)..........................................20

*Rostker* v. *Goldberg*, 453 U.S. 57 (1981) ..............................................................11

*Smith* v. *Department of Motor Vehicles*, 209 Cal. Rptr. 283
 (Cal. Ct. App. 1984) ...................................................................................31

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) .............................................25

*Southeastern Comm. Coll.* v. *Davis*, 442 U.S. 397 (1979) ......................................30

*Stillwell* v. *Kansas City Bd. of Police Comm'rs*,
 872 F. Supp. 682 (W.D. Mo. 1995)..............................................................29

*Strathie* v. *Department of Transp.*, 716 F.2d 227 (3d Cir. 1983) ............................32

*Supreme Ct. of N.H.* v. *Piper*, 470 U.S. 274 (1985) ...............................................34

*Tennessee* v. *Lane*, 541 U.S. 509 (2004) ..........................................................*passim*

*Tolbert* v. *McGriff*, 434 F. Supp. 682 (M.D. Ala. 1976) ........................................32

*Toledo* v. *Sanchez*, 454 F.3d 24 (1st Cir. 2006) ...............................................24, 29

*United States* v. *Georgia*, 546 U.S. 151 (2006)......................................... 6, 9-10, 18

*United States* v. *Virginia*, 518 U.S. 515 (1996).....................................................38

**CASES** (continued):                                                    **PAGE**

*Vermont Agency of Natural Res.* v. *United States*, 529 U.S. 765 (2000) ...............13

**STATUTES:**

Rehabilitation Amendments of 1984, Pub. L. No. 98-221, Title I, § 141(a),
         98 Stat. 17 ...................................................................................................35

Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506,
         Title V, § 502(b), 100 Stat. 1807, 1829 ........................................................35

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 ..................................4

Title II of the Americans with Disabilities Act, 42 U.S.C. 12131 *et seq* .................2
         42 U.S.C. 12131(2)..................................................................................37
         42 U.S.C. 12132..................................................................................37, 39
         42 U.S.C. 12132(2)..................................................................................40
         42 U.S.C. 12189..................................................................................27
         42 U.S.C. 12202..................................................................................14

28 U.S.C. 1291 .........................................................................................................1

28 U.S.C. 1331 .........................................................................................................1

42 U.S.C. 12101(a)(3)..............................................................................................41

42 U.S.C. 12101(a)(5)..............................................................................................38

42 U.S.C. 12101(a)(6)..............................................................................................34

53 Pa. Cons. Stat. § 2162 ..........................................................................................2

53 Pa. Cons. Stat. § 2164 ..........................................................................................2

53 Pa. Cons. Stat. § 2167(b) .....................................................................................2

**REGULATIONS:**

28 C.F.R. 104 ..........................................................................................................40

**REGULATIONS (continued):**                                    **PAGE**

28 C.F.R. 35.130 ..........................................................................................37

28 C.F.R. 35.150 ..........................................................................................37

28 C.F.R. 35.160 ..........................................................................................37

28 C.F.R. 35.161 ..........................................................................................37

28 C.F.R. 35.139(a) ......................................................................................40

28 C.F.R. 35.151 ..........................................................................................41

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. (1990) ...........................25

S. Rep. No. 116, 101st Cong., 1st Sess. (1989) ........................................32

*Americans with Disabilities Act: Hearing on H.R. 2273 Before the
Subcomm. on Civil & Constitutional Rights of the House Comm. on
the Judiciary*, 101st Cong., 1st Sess. (1989) .............................................26

*Hearing on H.R. 2273, the Americans with Disabilities Act of 1989:
    Joint Hearing Before the Subcommittees on Employment
    Opportunities and Select Education of the House Committee on
    Education and Labor*, 101st Cong., 1st Sess. (Sept. 13, 1989) ...................25

**MISCELLANEOUS:**

Deborah Piltch, et al., *The Americans with Disabilities Act and
    Professional Licensing*, 17 Mental & Physical Disability L. Rep. 556
    (Sept./Oct. 1993) ..............................................................................27

Deborah Rhode, *Moral Character as a Professional Credential*,
94 Yale L.J. 491 (1985) ..............................................................................28

National Council on the Handicapped, *On The Threshold Of
    Independence* (1988) ............................................................... 34-35

**MISCELLANEOUS (continued):**                                    **PAGE**

Phyllis Coleman and Ronald A. Shellow, *Ask About Conduct,*
        *Not Mental Illness:  A Proposal for Bar Examiners and Medical*
        *Boards to Comply with the ADA and the Constitution*,
        20 J. Legis. 147 (1994) ..................................................................................28

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-1867

RICHARD McDONALD,

Plaintiff-Appellant

v.

PENNSYLVANIA STATE POLICE, COLONEL FRANK PAWLOWSKI,

Commissioner of Pennsylvania State Police in his official capacity, MAJOR JOHN

GALLAGHER, in his individual capacity,

Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

_____

BRIEF FOR THE UNITED STATES AS INTERVENOR

_____

**STATEMENT OF JURISDICTION**

The district court had jurisdiction over plaintiff's claims pursuant to 28

U.S.C. 1331.  This court has jurisdiction pursuant to 28 U.S.C. 1291.

## QUESTION PRESENTED

Is Title II of the Americans with Disabilities Act, 42 U.S.C. 12131 *et seq.*, valid legislation under Section Five of the Fourteenth Amendment such that it can abrogate the States' sovereign immunity, in cases involving public licensing?

## STATEMENT OF THE CASE

1. Plaintiff Richard McDonald is a former police officer who spent 13 years with the city of Pittsburgh as a uniformed officer, a member of the drug task force, and finally a homicide detective (Appendix ["App."] 3a).  As required by Pennsylvania law, during this time he was certified by the Municipal Police Officer Education and Training Commission (the Commission), a twenty-member commission that administers training and certification of police officers (App. 3a; see 53 Pa. Cons. Stat. § 2164 (describing Commission's duties)).  Commission certification is required for employment at a wide variety of public agencies for any position involving "criminal or traffic law enforcement duties."  See 53 Pa. Cons. Stat. § 2162; see also 53 Pa. Cons. Stat. § 2167(b) (making any person "ineligible to receive any salary, compensation or other consideration for the performance of duties as a police officer unless the person has met all of the requirements as established by the commission and has been duly certified as having met those requirements by the commission").

- 3 -

From 2002 through 2006, McDonald was a special agent for the Pennsylvania Office of Attorney General.  This position does not require Commission certification, and McDonald let his certification lapse.  (App. 3a.) While in this employment, in December 2002, McDonald sustained a herniated disc that caused him chronic pain.  As a result, he was terminated for inability to perform his duties (App. 4a).  In 2006, McDonald began taking the narcotic pain reliever Avinza.  He contends that, while taking this drug, he has no relevant physical limitations and can perform all the duties of a police officer, including bending and lifting.  (App. 4a.)

In August 2007, McDonald began a new position as police chief of the Borough of Ellwood City (App. 4a).  This position required Commission certification, and so the Borough asked that the Commission certify McDonald (App. 4a-5a).  It submitted physical and mental examinations, both of which concluded that McDonald was fit to serve (App. 5a).  In October 2007, the Commission denied McDonald certification based on its medical advisor's opinion that McDonald's back injury limited him to light or medium-light duty (App. 5a). In 2008, the Commission again denied McDonald certification after its medical advisor found it uncertain whether the narcotic would permit appropriate responses "in situations that require split second thinking and instantaneous action" (App. 8a).

McDonald's contract with the Borough expired at the end of 2008.
McDonald now is employed with a private company (App. 9a).

2.  McDonald sued the Pennsylvania State Police (PSP), the commissioner
of the PSP (who is also the chairman of the Commission) in his official capacity,
and the executive director of the Commission in his individual capacity.  He brings
claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794; Title II
of the Americans with Disabilities Act, 42 U.S.C. 12131 *et seq.*; and the Due
Process Clause.  He seeks compensatory damages, injunctive relief (including an
order that he be certified as a police officer) and attorney's fees and costs.  (App.
9a.)

Defendants moved for summary judgment.  They argued that (1) the Title II
claim was barred by Eleventh Amendment immunity; (2) the Commission was not
subject to a Rehabilitation Act suit because it was a distinct entity from the PSP
and received no federal funds of its own; (3) McDonald neither had a disability nor
was regarded as having a disability, because he was excluded only from
performing certain positions and not from a sufficiently broad class of jobs; (4)
McDonald had not been deprived of due process; and (5) defendants were entitled
to qualified immunity on the due process claim.

3.  The district court granted summary judgment and dismissed the case.
With respect to the due process and qualified immunity claims, it dismissed for

largely the reasons proffered by the defendants.  (App. 14a-16a.)  With respect to the Title II and Rehabilitation Act claims, however, it dismissed on the ground that the Commission is not a "covered entity" and therefore "is not subject to the ADA [or Rehabilitation Act] discrimination provisions" (App. 13a).

4.   On appeal, the defendants devote only two pages to defending the district court's decision regarding the Title II and Rehabilitation Act claims.  See Br. for Appellees 12-14.  They primarily ask this Court to affirm the dismissal of those claims on the grounds they argued below – Eleventh Amendment immunity with respect to the Title II claim, see *id.* 14-24; lack of federal funding with respect to the Rehabilitation Act claim, see *id.* 24-29; and lack of disability with respect to both, see *id.* 29-33.

The United States intervened to defend the constitutionality of Title II's abrogation of sovereign immunity.

## SUMMARY OF ARGUMENT

1.  This Court should not reach unnecessarily the question of whether Title II validly abrogates sovereign immunity under the circumstances of this case.  Before entertaining that constitutional question, this Court should decide three other questions, the resolution of which may render constitutional adjudication unnecessary.

As the Supreme Court held in *United States* v. *Georgia*, 546 U.S. 151 (2006), under traditional principles of constitutional avoidance, a court should not decide the validity of Title II's abrogation of immunity until it decides (1) whether plaintiff has made out a Title II claim and (2) whether plaintiff's allegations also state a constitutional claim.  If the plaintiff does not state a Title II claim, or if the plaintiff's allegations also constitute a valid constitutional claim, there is no need for a court to proceed to the abrogation analysis.  *Id.* at 159.  Here, the defendants contend that plaintiff's Title II claim fails both for the reasons stated by the district court and because plaintiff was not regarded as having a disability.  Meanwhile, the plaintiff contends that he states not only a Title II claim, but also one under the Due Process Clause.  This Court should resolve those disputes before reaching the abrogation question.

Additionally, plaintiff alleges that the defendants received federal funding such that they have waived sovereign immunity for his claim under Section 504 of the Rehabilitation Act.  This Court should determine whether the defendants are subject to suit for damages under Section 504; if they are, the plaintiff's Title II claim is redundant, and this Court need not analyze it further.

2.  Should the Court reach the issue, it should find that Title II validly abrogates the States' sovereign immunity with respect to claims alleging disability discrimination in public licensing.  As the Supreme Court held in *Tennessee* v.

*Lane*, 541 U.S. 509, 524 (2004), Title II was enacted "against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." That history, the Court held, authorized Congress to enact prophylactic legislation to protect the rights of people with disabilities to receive on an equal footing all "public services," see *id.* at 528-529, including but not limited to public licensing. As this Court observed in *Bowers* v. *NCAA*, 475 F.3d 524, 554 & n.35 (3d Cir. 2007), after *Lane* there can be no question that Congress collected sufficient evidence of disability discrimination to pass prophylactic legislation covering all public services. There is no merit to the State's contention that this Court should reconsider *Bowers*.

Accordingly, with respect to the abrogation issue, the only question before this Court is whether Title II is a congruent and proportional response to that record of discrimination in this context. This Court should consider that question with respect to public licensing decisions in general, and not simply the subset of "professional licensing" urged by the State. Individuals with disabilities face comparable discrimination in all licensing decisions, implicating similar due process and equal protection concerns, while "the manner in which the legislation operates" to remedy such discrimination is comparable in such cases. See *Lane*, 541 U.S. at 531 n.18. Accordingly, there is no good reason to sever "professional

licensing" from "non-professional licensing" for purposes of the congruence and proportionality analysis.

Individuals with disabilities have faced a long history of discrimination in licensing determinations, including in occupational licensing.  Moreover, in this context, Title II's requirements are carefully tailored to protect against the proven risk of unconstitutional discrimination in the provision of social services, while respecting the States' legitimate interests.  In particular, Title II does not require a State to grant a license to anyone where doing so could pose an actual threat to anyone's health or safety.  It merely requires that States determine whether license applicants pose such a threat without reliance on unwarranted stereotypes about the capabilities of individuals with disabilities and that States avoid requirements and procedures that unnecessarily prevent those individuals from getting licenses for which they otherwise are qualified.  Accordingly, as applied to licensing decisions, Title II's requirements represent a congruent and proportional response to official discrimination.  They represent a good-faith effort to make meaningful the guarantees of the Fourteenth Amendment, not an illicit attempt to rewrite them.

**ARGUMENT**

**I**

**THIS COURT SHOULD NOT RULE ON THE VALIDITY OF TITLE II'S ABROGATION OF SOVEREIGN IMMUNITY BEFORE ADDRESSING ISSUES THAT COULD MAKE ADJUDICATING THAT QUESTION UNNECESSARY**

This Court should not rule on the constitutional validity of Title II's abrogation of sovereign immunity under the circumstances of this case until it decides several preliminary questions. The answer to any of these preliminary questions could make it unnecessary for this Court to adjudicate the abrogation issue. The United States takes no position on the merits of these questions.

1. The Supreme Court in *United States* v. *Georgia*, 546 U.S. 151 (2006), mandated a procedure for lower courts to follow when confronted with a claim of Eleventh Amendment immunity in a case involving Title II. In *Georgia*, the state defendants argued that Title II, as applied to corrections programs, failed to validly abrogate the States' Eleventh Amendment immunity. The Court held that Title II validly abrogates that immunity for any claims that also constitute constitutional violations. It declined to decide any further questions about Title II's validity, instead remanding for lower courts to determine first whether the plaintiff alleged any valid Title II claims that did not also state constitutional violations. *Id.* at 159.

In doing so, *Georgia* set forth a three-step process for how Eleventh Amendment immunity challenges in Title II cases should proceed. Courts must

first determine "which aspects of the State's alleged conduct violated Title II."
*Georgia*, 546 U.S. at 159.  If plaintiff has made out a Title II violation, a court next
should determine "to what extent such misconduct also violated the Fourteenth
Amendment."  *Ibid.*  Finally, and only if a court finds that a State's "misconduct
violated Title II but did not violate the Fourteenth Amendment," it should reach the
question "whether Congress's purported abrogation of sovereign immunity as to
that class of conduct is nevertheless valid."  *Ibid.*[1]

Accordingly, this Court has correctly held that *Georgia* requires it, before
deciding the abrogation question, to determine "if any aspect of the [state
defendant's] alleged conduct forms the basis for a Title II claim."  *Bowers* v.
*NCAA*, 475 F.3d 524, 553 (3d Cir. 2007).  Only after deciding that question in the
affirmative – and ascertaining that the plaintiff's claim did not also state a
constitutional violation – did *Bowers* move on to decide that Title II was a
proportionate and congruent response to the history of constitutional violations in

---

[1]  Shortly after *Georgia*, the Sixth Circuit held in an unpublished opinion
that a complaint failed to state a Title II violation, but nonetheless went on to hold
also that Title II did not validly abrogate sovereign immunity in that context.  See
*Haas* v. *Quest Recovery Servs., Inc.*, 174 F. App'x 265 (6th Cir. 2006).  The
Supreme Court granted certiorari, vacated, and remanded for reconsideration.
*Haas* v. *Quest Recovery Servs., Inc.*, 549 U.S. 1163 (2007); see *ibid.* (Ginsburg, J.,
concurring) ("The United States points out that had the Sixth Circuit attended to
[*Georgia*], it might not have reached the [abrogation] question.").

education and so validly abrogated sovereign immunity in that context.  *Id.* at 553-555.

Under *Georgia* and *Bowers*, this Court may not decide the validity of Title II's abrogation of sovereign immunity in this context unless and until it finds, first, that defendants' conduct "forms the basis for a Title II claim," *Bowers*, 475 F.3d at 553, and second, that such conduct does not also form the basis for a constitutional claim, *id.* at 553-554.  This rule is in keeping with the "fundamental and longstanding principle of judicial restraint" that "courts avoid reaching constitutional questions in advance of the necessity of deciding them."  *Lyng* v. *Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988).  Moreover, this constitutional avoidance principle is at its apex when courts address the constitutionality of an Act of Congress, "the gravest and most delicate duty" that courts are "called upon to perform."  *Rostker* v. *Goldberg*, 453 U.S. 57, 64 (1981) (citation omitted); accord *Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 129 S. Ct. 2504, 2513 (2009).

Here, the district court ruled that plaintiff failed to state a Title II claim because the defendants are not "covered entities."  The defendants also contend that plaintiff's Title II claim fails because he was not regarded as disabled.  Moreover, plaintiff contends that the district court erred in dismissing his due process claim, which is based on largely the same allegations and evidence.

- 12 -

Accordingly, before reaching the abrogation question, this Court first should determine (1) whether plaintiff has made out a Title II claim and (2) if so, whether plaintiff's allegations and evidence also support his due process claim.  Unless this Court reverses the district court on the first question and affirms the district court on the second, there is no reason for it to reach the question of whether Title II validly abrogates sovereign immunity in this context.

2.  Additionally, before reaching the abrogation question, this Court should determine whether defendants receive federal funding such that they are subject to suit under Section 504 of the Rehabilitation Act of 1973.  Section 504 imposes upon recipients of federal funds the same substantive obligations that Title II imposes upon all public entities.  See, *e.g.*, *Disabled in Action of Pa.* v. *SEPTA*, 635 F.3d 87, 91 & n.5 (3d Cir. 2011); *McDonald* v. *Pennsylvania*, 62 F.3d 92, 94-95 (3d Cir. 1995).  Accordingly, should this Court find the defendants subject to suit under Section 504, it has no reason to determine whether Title II validly abrogates sovereign immunity.  See *Bennett-Nelson* v. *Louisiana Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005) (declining to reach Title II abrogation question after finding that defendants had waived immunity for substantively identical Section 504 claim), cert. denied, 547 U.S. 1098 (2006).  It would be particularly

inappropriate for this Court to reach the abrogation question unnecessarily where, as here, the district court did not reach the question.[2]

## II

## TITLE II VALIDLY ABROGATES THE STATES' SOVEREIGN IMMUNITY WITH RESPECT TO CLAIMS INVOLVING LICENSING

Should this Court nonetheless reach the question, it should hold that Title II of the Americans with Disabilities Act validly abrogates the States' sovereign immunity with respect to claims involving licensing. Title II was enacted "against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights."

---

[2]  In *Bowers*, this Court found it necessary to decide whether Title II validly abrogated sovereign immunity for claims related to public education, notwithstanding that the plaintiff in that case maintained a substantively identical claim under Section 504. The district court had dismissed both claims and the plaintiff sought to reinstate both on appeal. Under such circumstances, this Court found, remanding the case without reviewing the dismissal of the Title II claim would be to "in effect prune away [plaintiff's] Title II claim" against the plaintiff's wishes. *Bowers*, 475 F.3d at 550.

This case presents different circumstances. The district court did not reach the validity of Title II's abrogation, and so plaintiff does not ask this Court to review an adverse determination as to that question. And while state defendants are entitled to an immediate sovereign immunity determination where such immunity may protect them from being sued, see *Puerto Rico Aqueduct & Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-145 (1993), they have no such entitlement to a gratuitous constitutional determination that has no practical impact on whether a case or even a claim can proceed. Cf. *Vermont Agency of Natural Res.* v. *United States*, 529 U.S. 765, 779 (2000) (declining to decide Eleventh Amendment question that would not advance the "ultimate issue" of "whether unconsenting States can be sued").

*Tennessee* v. *Lane*, 541 U.S. 509, 524 (2004).  Accordingly, it is settled that Congress was within its authority pursuant to Section Five of the Fourteenth Amendment to pass prophylactic legislation to protect the right of people with disabilities to receive public services on an equal footing.  *Id.* at 528-529. Congress's response – to bar overt discrimination on the basis of disability and require reasonable accommodations with respect to all public services, including the licensing at issue here – was congruent and proportional to that record of discrimination.

As a preliminary matter, all other requirements for abrogation are satisfied here.  Although the Eleventh Amendment ordinarily renders a State immune from suits in federal court by private citizens, Congress may abrogate that immunity so long as it "unequivocally expresse[s] its intent to abrogate that immunity" and "act[s] pursuant to a valid grant of constitutional authority."  *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, 73 (2000).  There is no question that Congress unequivocally expressed its intent to abrogate the States' sovereign immunity with respect to claims under the ADA.  See 42 U.S.C. 12202; *Lane*, 541 U.S. at 518. Similarly, it is settled that "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment."

*Lane*, 541 U.S. at 518.  The only question, therefore, is whether Title II is valid

Section Five legislation in this context.

1.  The State's primary argument – that Title II is valid Section Five

legislation only in those contexts for which Congress compiled a record of official

discrimination – runs contrary to precedent of the Supreme Court and this Court,

and the State offers no reason for this Court to rethink that settled jurisprudence.

As *Lane* squarely held, and this Court later confirmed, the long and broad history

of official discrimination suffered by individuals with disabilities authorized

Congress to exercise its Section Five authority to protect their constitutional rights

with respect to all public services and programs.  *Lane*, 541 U.S. at 524; accord

*Bowers* v. *NCAA*, 475 F.3d 524, 554 & n.35 (3d Cir. 2007).[3]  Accordingly, the

State's assertion that Title II can abrogate sovereign immunity only for "those

public services for which a historical pattern of disability discrimination was

before Congress when enacting the ADA," see Br. for Appellees 15, is squarely

foreclosed by controlling law.  Indeed, the State acknowledges that its argument is

contrary to *Bowers*, although it characterizes the relevant statement in *Bowers* as

"an errant dictum."  *Id.* 22.  This Court's statement in *Bowers* that Congress had

authority to pass prophylactic legislation covering disability discrimination in all

---

[3]  This Court reached a similar conclusion in *Cochran* v. *Pinchak*, 401 F.3d 184, 191 (3d Cir.), vacated, 412 F.3d 500 (3d Cir. 2005).

public services was essential to its ultimate holding that Title II validly abrogates

sovereign immunity in the education context.  Moreover, it was correct.

Title II is sweeping non-discrimination legislation that applies to all public

services, programs, and activities.  Congress cannot be expected to anticipate, let

alone justify with evidence, every context in which such a broad law may apply, as

if each such context were a fully separate statute with its own legislative history.

What it can do is make a voluminous record demonstrating that individuals with

disabilities have faced public discrimination across the board, thus justifying anti-

discrimination legislation that covers all public services, programs, and activities.

And in *Lane*, the Supreme Court held that Congress did just that.

*Lane* noted the wide variety of contexts in which individuals with disabilities

faced public discrimination, including not only access to judicial services, but also

voting, marrying, zoning, education, and other contexts.  See 541 U.S. at 524-525.

It held that Congress's finding of widespread discrimination in public services,

"together with the extensive record of disability discrimination that underlies it,

makes clear beyond peradventure that *inadequate provision of public services and*

*access to public facilities was an appropriate subject for prophylactic legislation*."

*Id.* at 529 (emphasis added).  *Lane* thus clearly held that the record compiled by

Congress makes "provision of public services and access to public facilities" as a

whole – that is, the entirety of Title II – "an appropriate subject for prophylactic

legislation," not simply the access to judicial services at issue in that case.

Accordingly, *Lane* concluded, "[t]he only question that remains is whether Title II

is an appropriate response to this history and pattern of unequal treatment."  541

U.S. at 530.  In addressing this question – and only this question – *Lane* engaged in

context-specific analysis, because Title II's remedy operates differently in different

contexts.  *Id.* at 530-531.  But *Lane* did not leave open, in any context, whether

Congress compiled a sufficient history of disability discrimination to trigger its

authority to legislate.

Accordingly, most circuits – including this one – have read *Lane*, correctly,

as "foreclos[ing] the need for further inquiry" with respect to whether Congress

compiled sufficient evidence of discrimination to trigger its authority to legislate.

See *Klingler* v. *Director, Dep't of Revenue*, 455 F.3d 888, 896 (8th Cir. 2006);

accord *Bowers*, 475 F.3d at 554-555 & n.35; *Constantine* v. *Rectors & Visitors of*

*George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005); *Association for Disabled*

*Ams., Inc.* v. *Florida Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005); *McCarthy* v.

*Hawkins*, 381 F.3d 407, 423 (5th Cir. 2004).  But see *Guttman* v. *Khalsa*, 669 F.3d

1101, 1117 (10th Cir. 2012), petition for rehearing pending, Docket No. 10-2167

(filed Feb. 27, 2012).

Nothing in *Georgia* warrants reconsideration of *Bowers*, contrary to the

State's argument.  See Br. for Appellees 19-22.  As an initial matter, *Bowers* was

decided *after Georgia*, and repeatedly cited *Georgia*, and so it cannot warrant a panel of this Court's revisiting a holding of another panel. More fundamentally, nothing in *Georgia* is inconsistent with anything in *Bowers*. The State's argument to the contrary consists largely of arguing against a strawman, as the State repeatedly asserts that, in light of *Georgia*, *Lane* cannot be read to hold that Title II "abrogated 11th Amendment immunity wholesale for *all* forms of public services." See Br. for Appellees 15.[4] That statement is true as far as it goes, but is beside the point. Both *Georgia* and *Lane* reserve the question of Title II's congruence and proportionality to the remedying of past or present discrimination in any given context, but *Lane* and *Bowers* make clear – and nothing in *Georgia* is to the contrary – that Congress need not document that past discrimination in every context in which Title II may apply.

Because the statutory provision at issue here is the same one that was at issue in *Lane*, and it remedies the same history of official disability discrimination in this context (and every other one), this case is similarly unlike *Coleman* v. *Supreme Court of Maryland*, No. 10-1016, 2012 WL 912951 (S. Ct. Mar. 20,

---

[4]  See also *id.* 18 ("Definitely *Lane* did not hold that Title II of the ADA was a valid abrogation of Eleventh Amendment immunity as applied to all public services."); *id.* 19 ("Had the *Lane* court comprehensively and authoritatively validated Title II as a proper abrogation of the 11th amendment broadly for all state public services challenged under its terms, regardless of their specific nature, why did the Supreme Court not simply just say so in *U.S.* v. *Georgia*, 546 U.S. 151 (2006)?").

- 19 -

2012), which was decided after the State submitted its brief in this appeal.  In

*Nevada Department of Human Resources* v. *Hibbs*, 538 U.S. 721 (2003), the

Supreme Court had determined that the family-care provision of the Family and

Medical Leave Act, 29 U.S.C. 2612(a)(1)(C), was a congruent and proportional

response to documented sex discrimination.  By contrast, *Coleman* determined that

a separate provision of that Act, the self-care provision, was not a congruent and

proportional response to sex discrimination.  Indeed, *Coleman* found, the self-care

provision was not predominantly aimed at sex discrimination at all:  "The

legislative history of the self-care provision reveals a concern for the economic

burdens on the employee and the employee's family resulting from illness-related

job loss and a concern for discrimination on the basis of illness, not sex."  See

*Coleman*, 2012 WL 912951, at *6.

Because the self-care provision was an entirely different provision, and was

meant to remedy an entirely different sort of discrimination, *Coleman* found that it

could not abrogate sovereign immunity without a separate showing that it remedied

a history of official discrimination, a showing that Congress had not made.  See *id.*

at *8-*9.  But neither *Coleman* nor any other precedent of the Supreme Court

justifies requiring Congress to document every way in which the *same* provision of

a statute remedies the *same* type of discrimination.

- 20 -

The significance of this point is illustrated by *Roe* v. *Johnson*, 334 F. Supp. 2d 415 (S.D.N.Y. 2004), upon which the State relies heavily.  See Br. for Appellees at 15, 23-24.  *Roe* concluded that Title II does not validly abrogate sovereign immunity in the context of attorney licensing simply because Congress did not document a history of discrimination with such specificity.  See 334 F. Supp. 2d at 422-423.  As described below, *Roe* – a case litigated by a pro se plaintiff without notice to the Justice Department – overlooked legislative history that *did* discuss discrimination in attorney licensing.  But more broadly, its failure to conform with the analysis required by *Lane* and *Bowers* renders it inapplicable as a precedent here.  By contrast, a district court in this circuit properly applied *Bowers* and concluded that, in asking courts in this circuit to follow *Roe*, state defendants "demand too narrow an interpretation of Congress's findings of a pattern of state discrimination."  *See Reynolds* v. *Pennsylvania*, No. 3:09-cv-1492, 2010 WL 2572798, at *9 (M.D. Pa. June 21, 2010).[5]

---

[5] Similarly, *Guttman*, which was decided after the State submitted its brief, found that Title II was not properly abrogated in this context only after explicitly finding that Congress must document a pattern of discrimination in every context in which Title II is to be valid Section Five legislation, contrary to the finding of this Court and others.  See 669 F.3d at 1117.  For that reason, among others, the United States has asked the Tenth Circuit to rehear *Guttman* en banc.  That petition is pending.

2. Properly at issue here is the constitutionality of Title II's abrogation of sovereign immunity with respect to all official licensing. The State does not explain, nor is there a good reason, why its abrogation analysis focuses only on state provision of the narrower category of "professional licenses." See, *e.g.*, Br. for Appellees 15.[6] Contrary to the State's assertion, *Lane* neither engaged in nor endorsed such a "narrow, as-applied" congruence-and-proportionality analysis, as though every application of Title II were a wholly separate statute. See *id.* 22. Rather, it held that some classes of cases are so different from others, in the rights implicated and "the manner in which the legislation operates to enforce that particular guarantee," as to make those applications of Title II fully severable. See *Lane*, 541 U.S. at 530-531 & n.18. For example, Title II's protections for "the accessibility of judicial services" could readily be severed from those involving voting rights or access to hockey rinks, because it was "unclear what, if anything, examining Title II's application to hockey rinks or voting booths can tell us about whether Title II substantively redefines the right of access to the courts." *Id.* at 531 n.18.

---

[6] It is true that plaintiff does not argue otherwise, but the constitutionality of an Act of Congress cannot depend on the arguments made by individual plaintiffs, who often are pro se or otherwise not in a position to make all available arguments. Indeed, it is for that reason that the United States is entitled to intervene to present its own defense of a federal statute. See 28 U.S.C. 2403(a).

- 22 -

Title II's application to "professional licensing" cannot similarly be severed from its application to all other public licensing.  Every licensing decision adjudicates whether someone is qualified and should receive official permission to do something.  Accordingly, individuals with disabilities face comparable discrimination in all licensing decisions, implicating similar due process and equal protection concerns, while "the manner in which the legislation operates" to remedy such discrimination is comparable in all such cases.  See *Lane*, 541 U.S. at 531 n.18.  Moreover, the State does not even attempt to explain what constitutes "professional licensing," as opposed to "non-professional licensing."  There is no basis for carving out an artificial sub-category of licensing decisions – apparently based not on anything unique to those licensing decisions, but rather on the professional opportunities those licenses confer – and then faulting Congress for failing to recognize such a category and document discrimination in it.

*Lane* itself illustrates the principle that a court must consider a broader context than the "narrow, as-applied" challenge before it.  The plaintiffs in that case both were paraplegics who contended that courthouses were inaccessible to individuals who relied upon wheelchairs.  See *Lane*, 541 U.S. at 513.  As a result, one plaintiff alleged that he was unable to appear to answer charges against him, while the other alleged that she could not perform her work as a court reporter.  *Id.* at 513-514.  The Supreme Court did not limit the abrogation question before it to

either the specific judicial services (such as criminal adjudication) alleged to be inaccessible or the particular sort of access sought (wheelchair access to a courtroom).  Rather, it framed the question broadly, with respect "to the class of cases implicating the accessibility of judicial services."  *Id.* at 531.

Accordingly, the Court found relevant to its analysis a number of constitutional rights and fact patterns not implicated by the plaintiffs' claims. Neither of the *Lane* plaintiffs alleged that he or she was excluded from jury service or subjected to a jury trial that excluded persons with disabilities.  Neither was prevented from participating in civil litigation, nor did either allege a violation of First Amendment rights.  The nature of plaintiffs' disabilities did not implicate Title II's requirement that government, in the administration of justice, make available measures such as sign language interpreters or materials in Braille.  Yet the Supreme Court broadly considered the full range of constitutional rights and Title II remedies potentially at issue in the broad "class of cases implicating the accessibility of judicial services."  *Lane*, 541 U.S. at 531.

Similarly, in *Bowers*, this Court properly looked at Title II's application "in the context of public education," 475 F.3d at 555 n.35, not in the narrow context of intercollegiate sports eligibility in which *Bowers* arose.  Other courts likewise have declined to focus their inquiries on the narrow sub-category of public education, such as community colleges, at issue in the particular cases before them.  See

- 24 -

*Toledo* v. *Sanchez*, 454 F.3d 24, 36 (1st Cir. 2006) (rejecting the argument that Congress was required to show history of discrimination in higher education in particular), cert. denied, 549 U.S. 1301 (2007).

Following *Lane* and *Bowers*, this Court should determine the congruence and proportionality of Title II within the entire "class of cases" involving state licensing. See *Lane*, 541 U.S. at 531. That is the level of generality at which Congress legislated in enacting Title II, and it is the level of generality at which applications of Title II meaningfully can be severed from each other.

3. Having amply documented a history of disability discrimination in public services more generally, Congress was not required to document a history of disability discrimination in the specific context of public licensing to trigger its authority to pass prophylactic legislation. However, the history of discrimination in licensing – and Title II's success in preventing and remedying that discrimination – provides evidence that Title II is a congruent and proportional remedy for real discrimination in this context. Adjudicating the validity of Title II as Section Five legislation in any particular context requires consideration of: (1) the constitutional rights Title II protects in that context, see *Lane*, 541 U.S. at 522; (2) the history of those rights being violated, see *id.* at 529; and (3) whether Title II is "an appropriate response to this history and pattern of unequal treatment," see *id.* at 530. Put differently, whether Title II validly enforces constitutional rights in a

particular context "is a question that 'must be judged with reference to the historical experience which it reflects.'"  *Id.* at 523 (quoting *South Carolina* v. *Katzenbach*, 383 U.S. 301, 308 (1966)).

The Due Process Clause requires that licensing and similar official decisions be made after a fair and individualized hearing, and not on the basis of an "irrebuttable presumption of incompetency" based entirely on generalizations about individuals with disabilities.  *Gurmankin* v. *Costanzo*, 556 F.2d 184, 188 (3d Cir. 1977).  Individuals with disabilities have faced precisely this sort of arbitrary decision-making, as well as equal protection violations, on a regular basis.

a.  Congress had before it evidence of blatant disability discrimination in occupational licensing, particularly of teachers.  For example, the House Report points to a woman denied a teaching license on the grounds that she was paralyzed.  H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 29 (1990) ("House Report").  Congress was told of another teacher denied a license "on the grounds that being confined to a wheelchair as a result of polio, she was physically and medically unsuited for teaching," leading her to sue the school system for depriving her of her constitutional rights.  *Hearing on H.R. 2273, the Americans with Disabilities Act of 1989:  Joint Hearing Before the Subcommittees on Employment Opportunities and Select Education of the House Committee on Education and Labor*, 101st Cong., 1st Sess. 78 (Sept. 13, 1989) (referring to *Heumann* v. *Board*

*of Education*, 320 F. Supp. 623 (S.D.N.Y. 1970)).  Teachers from several states told the Task Force on the Rights and Empowerment of Americans with Disabilities – a body appointed by Congress that took written and oral testimony from numerous individuals with disabilities from every part of the country as to the obstacles they faced[7] – about requirements that excluded deaf teachers from teaching deaf students.  See, *e.g.*, CA 261; KY 732; TX 1503; TX 1549.  And a blind man was denied a license to be a day care provider with no explanation, notwithstanding references that explicitly stated that his blindness did not prevent him from doing the job.  MA 808.

Congress also had before it considerable evidence that the tests required to be licensed for many professions were inaccessible for or otherwise discriminated against individuals with disabilities.  One lawyer submitted testimony of hearing "scores of horror stories on an annual basis arising from the experiences of persons with disabilities who attempt to take bar examinations."  *Americans with Disabilities Act: Hearing on H.R. 2273 Before the Subcomm. on Civil &*

---

[7]  In *Lane*, the Court relied on the Task Force's "numerous examples of the exclusion of persons with disabilities from state judicial services and programs." See 541 U.S. at 527.  The materials collected by the Task Force were lodged with the Court in *Board of Trustees of the University of Alabama* v. *Garrett*, 531 U.S. 356 (2001), and catalogued in Appendix C to Justice Breyer's dissent in that case. See *Lane*, 541 U.S. at 526-527.  The *Garrett* appendix cites to the documents by State and Bates stamp number, *Garrett*, 531 U.S. at 389-424, a practice we follow in this brief.  In addition, an addendum to this brief provides for the convenience of this Court and the parties a copy of all the documents cited herein.

*Constitutional Rights of the House Comm. on the Judiciary*, 101st Cong., 1st Sess.

162 n.3 (1989); see *id.* 169 (newspaper story describing problems faced by lawyers

with disabilities, including inaccessible testing sites).  Similarly, the director of a

non-profit told the Task Force of people "who are not allowed interpreters or

readers to assist in taking certification examinations for professional licenses."  TX

1528; accord TX 1542 (deaf individual not given "appropriate interpreter" to take

state cosmetology exam); TX 1543 (blind individual "not allowed to take the state

chiropractic board exam because he was unable to read X-rays alone").

Indeed, Congress recognized this problem and explicitly banned

discrimination in certification and testing by public and private entities alike in

Title III of the ADA.  See 42 U.S.C. 12189.  This ban, which is incorporated into

Title II's requirements for public entities, see, *e.g.*, *Bartlett* v. *New York State Bd.

of Law Exam'rs*, 226 F.3d 69, 78 (2d Cir. 2000), has significantly ameliorated

previously entrenched discriminatory practices.  For example, individuals with

disabilities have obtained relief from state licensing boards that historically failed

to accommodate them in taking licensing examinations.[8]  They also have won

---

[8]  See Deborah Piltch, et al., *The Americans with Disabilities Act and Professional Licensing*, 17 Mental & Physical Disability L. Rep. 556, 558-561 (Sept./Oct. 1993); see, *e.g.*, *D'Amico* v. *New York State Bd. of Law Exam'rs*, 813 F. Supp. 217, 223-224 (W.D.N.Y. 1993) (granting plaintiff with visual disability injunction requiring additional time for bar examination); *Fowler* v. *New York State Bd. of Law Exam'rs*, 885 F. Supp. 66, 68-69 (W.D.N.Y. 1994) (finding that
(continued…)

relaxation of licensing applications that had inquired intrusively into every mental

health treatment, no matter how unrelated to fitness to practice.[9]  And they have

_____

(…continued)

*D'Amico* and follow-up litigation changed the state board's practices regarding requests for accommodation); *In re Rubenstein*, 637 A.2d 1131, 1139 (Del. 1994) (reversing, as "manifestly unfair," state law board's refusal to give extra time on multi-state portion of bar exam to attorney with documented learning disability). Notwithstanding these decisions, state licensing boards have continued to deny needed accommodations, forcing individuals with disabilities to enforce their Title II rights in court.  See, *e.g.*, *Bartlett*, 226 F.3d at 81-82 (requiring inquiry into whether plaintiff's disability slowed her reading sufficiently to entitle her to testing accommodations).

[9]  One article written in the run-up to the ADA's passage found that individuals with a history of psychological treatment "clearly risk extended inquiries and delay, and in some instances, a possibility of exclusion" based on inferences made by untrained examiners that "the mental health community would itself find highly dubious."  Deborah Rhode, *Moral Character as a Professional Credential*, 94 Yale L.J. 491, 581-582 (1985); see Phyllis Coleman and Ronald A. Shellow, *Ask About Conduct, Not Mental Illness:  A Proposal for Bar Examiners and Medical Boards to Comply with the ADA and the Constitution*, 20 J. Legis. 147, 147 (1994) ("Rather than identifying applicants who might injure future clients or patients, however, these questions merely perpetuate prejudice against the mentally ill."); *id.* at 155 ("Because the issue is behavior, information about character and fitness can better be gleaned from more focused, less intrusive questions about conduct.").  For early examples of Title II's effect on such discriminatory practices, see, *e.g.*, *Ellen S.* v. *Florida Bd. of Bar Exam'rs*, 859 F. Supp. 1489, 1491 (S.D. Fla. 1994) (denying motion to dismiss in challenge to bar admission questions that asked, *inter alia*, "Have you ever consulted a psychiatrist, psychologist, mental health counselor or medical practitioner for any mental, nervous or emotional condition, drug or alcohol use?"); *Clark* v. *Virginia Bd. of Bar Exam'rs*, 880 F. Supp. 430, 446 (E.D. Va. 1995) (striking down similarly overbroad question after finding "no evidence of correlation between obtaining mental counseling and employment dysfunction"); *Medical Soc'y of N.J.* v. *Jacobs*, No. 93-cv-3670, 1993 WL 413016, at *7 (D.N.J. Oct. 5, 1993) (finding unnecessary and overbroad medical licensing application questions covering any

(continued…)

forced licensing agencies to modify blanket policies of rejecting candidates that did

not conform with physical norms without individualized assessment of whether

they could perform the job.  For example, one court found that a city violated not

only Title II but also the Due Process Clause when it summarily rejected an

individual with a disability's request to be licensed as an armed security guard

without assessing whether he could perform the necessary functions.  See *Stillwell*

v. *Kansas City Bd. of Police Comm'rs*, 872 F. Supp. 682, 687-688 (W.D. Mo.

1995).

Moreover, Title II's protections for professional licensing are part of its

larger project of eliminating barriers to access to a profession – barriers well

documented by Congress.  This project includes Title II's mandate of non-

discrimination in education, which this Court and others have ruled validly

abrogates the States' sovereign immunity.  See *Bowers*, 475 F.3d at 556; *Toledo*,

454 F.3d at 39-40; *Constantine*, 411 F.3d at 490; *Association for Disabled Ams.,*

*Inc.*, 405 F.3d at 959.  It also includes Title I's requirement that private employers

not discriminate on the basis of disability.  Indeed, professional education,

professional licensing, and professional practice are so closely linked that a

_____

(…continued)
mental health treatment, where the state board instead could formulate questions
about problematic behavior).

professional school might try to defend its decision not to admit a student on the ground that the student's disability would preclude her from practicing or being licensed to practice. See *Southeastern Cmty. Coll.* v. *Davis*, 442 U.S. 397, 413 (1979). The State's position here would lead to the anomalous and unjust result that Title II is valid Section Five legislation where it requires state schools to avoid discrimination in admissions and provide testing accommodations, but not (1) where it requires similar steps of the state licensing boards that are the next steps to becoming a professional, or (2) where it bans the State from excluding an individual from the professions based on the same prejudices about fitness to practice upon which a private employer may not rely.

Accordingly, although it is improper to focus the abrogation inquiry on such a specific area as professional licensing, even within that narrow subject area, there is extensive evidence that individuals with disabilities have been considered unfit for the professions for discriminatory reasons and that Title II's remedies are proportional and congruent to such violations. That Congress heard little about discrimination in the specific context of professional licensing determinations does not indicate otherwise. If anything, it demonstrates the broad societal discrimination that, until recently, precluded individuals with disabilities from achieving the educational and other prerequisites to reach the point at which they could face this very specific type of discrimination in public licensing.

b.  Individuals with disabilities have experienced a long history of discrimination in many other types of public licensing.  As *Lane* recognized, "a number of States have prohibited and continue to prohibit persons with disabilities from engaging in activities such as marrying," 541 U.S. at 524; see *id.* at 524 n.8 (giving examples).

Individuals with disabilities also faced considerable discrimination in the provision of driver's licenses.  For example, States routinely violated the Due Process Clause as well as anti-discrimination law by summarily revoking the driver's licenses of individuals with various medical conditions such as epilepsy without individualized consideration of whether they were fit to drive.  See, *e.g.*, *Department of Transp.* v. *Clayton*, 546 Pa. 342, 353 (1996) (in culmination of decade-long string of Pennsylvania cases, affirming lower court decisions striking down state regulation banning anyone who had suffered from seizure from driving for year regardless of medical evidence that seizure was unlikely to recur);[10] *Smith* v. *Department of Motor Vehicles*, 209 Cal. Rptr. 283, 330 (Cal. Ct. App. 1984) (DMV unreasonably refused to license garbage truck driver whose diabetes was

---

[10]  Fifty years earlier, the same court had declared:  "There will, no doubt, be common agreement that a person afflicted with epilepsy is 'incompetent or unable to exercise reasonable and ordinary control over a vehicle' on the public highway." *Commonwealth* v. *Irwin*, 345 Pa. 504, 507 (1942).  *Cf. Lane*, 541 U.S. at 534-535 (Souter, J., concurring) (observing that the "judiciary itself has endorsed the basis for some of the very discrimination subject to congressional remedy").

controlled by insulin); *Strathie* v. *Department of Transp.*, 716 F.2d 227, 233-234

(3d Cir. 1983) (rejecting State's reasons for suspending the license to drive a

school bus of individual with hearing aid);[11] *Geen* v. *Foschio*, 94 F.R.D. 177, 180

(W.D.N.Y. 1982) (granting preliminary injunction on behalf of 486 individuals in

New York whose licenses were revoked for a year with no opportunity to be

heard); *Tolbert* v. *McGriff*, 434 F. Supp. 682, 684-687 (M.D. Ala. 1976) (license of

truck driver whose epilepsy was controlled by medication was wrongfully

revoked); see also CA 262-263; MI 950.  Other times, States simply refused to

license individuals based on misconceptions about their disabilities.  See, *e.g.*, HI

458 (refusal to issue driver's license to someone who had driven for years in

another State without incident); OH 1231 (individual wrongfully denied a driver's

license for many years based on state agency's incorrect understanding of vision

limitations).  Often, the denial of such licenses effectively foreclosed employment

opportunities as surely as the denial of occupational licenses.

Even when not directly barred from obtaining marriage or other licenses,

individuals with disabilities have suffered discrimination in the administration of

licensing programs.  For example, one wheelchair user was denied a marriage

---

[11]   In enacting the ADA, Congress was aware of this Court's decision in *Strathie*, which it pointed to in the legislative history as an example of the need to ensure that determinations are made after "a fact-specific individualized inquiry." S. Rep. No. 116, 101st Cong., 1st Sess. 27 (1989); House Report 57.

license because the local courthouse was inaccessible.  WY 1786.  Another person

could not obtain a driver's license because the exam was held in an inaccessible

room down a flight of stairs.  ND 1170.  And a person who had been driving

without incident for twenty years was forced to submit to an unnecessary medical

examination in order to renew his license.  TX 1513-1514.

c.  Not only is there a well-documented history of discrimination against

individuals with disabilities in this context, but the consequences of that

discrimination are grave.  The appropriateness of Section Five legislation turns not

only on the pervasiveness of discrimination, but also on the "gravity of the harm

[the law] seeks to prevent."  See *Lane*, 541 U.S. at 523.  Licensing programs

sometimes directly implicate fundamental rights, and even where they do not, the

unreasonable denial of a public license can work substantial harm.

Licensing decisions restrict or expand individuals' ability to engage in a

broad range of basic freedoms, including the right to participate in a chosen

profession and to travel.  Discriminatory limitations on those freedoms can have

enormous consequences for the lives of individuals with disabilities – particularly

because those individuals already face tremendous barriers.

For example, denial of an occupational license severely restricts anyone's

employment opportunities.  That is particularly true where an individual has

invested years of education and/or work experience to become eligible for that

- 34 -

license and has no other comparable expertise.  Accordingly, courts have

recognized that, like decisions about education, decisions about professional

licensing – notwithstanding that they are subject only to rational basis scrutiny

under the Constitution – have vital importance.  See *Baird* v. *State Bar of Ariz.*,

401 U.S. 1, 8 (1971) (opinion of Black, J.) (plurality opinion) ("The practice of law

is not a matter of grace, but of right for one who is qualified by his learning and his

moral character."); *Board of Regents* v. *Roth*, 408 U.S. 564, 574 (1972) ("[A]

State, in regulating eligibility for a type of professional employment, cannot

foreclose a range of opportunities 'in a manner . . . that contravene[s] . . . Due

Process.'") (quoting *Schware* v. *Board of Bar Exam'rs*, 353 U.S. 232, 238 (1957));

cf. *Supreme Ct. of N.H.* v. *Piper*, 470 U.S. 274, 281-282 (1985) (membership in the

bar is a fundamental right for purposes of Privileges and Immunities Clause).

Recovering from such a denial is even more difficult for individuals with

disabilities, who face well-documented discrimination in employment and

educational opportunities.  Congress found that "people with disabilities, as a

group * * * are severely disadvantaged * * * economically."  42 U.S.C.

12101(a)(6).  As of 1980, fully two-thirds of working-age individuals with

disabilities had no employment at all, and only one quarter worked full time.

National Council on the Handicapped, *On The Threshold Of Independence* 14

(1988) (*Threshold*).[12]  An improper denial of an occupational license may leave an individual with a disability with few or no employment prospects.

Similarly, discrimination in the provision of drivers' licenses can deprive persons with disabilities of an independence that other people take for granted and contributes to their substantial isolation.  Congress was told that two-thirds of persons with disabilities had not attended a movie or sporting event in the past year; three-fourths had not seen live theater or music performances; and thirteen percent never went to grocery stores.  *Threshold* 16-17.  Improper deprivation of a driver's license makes it particularly difficult for an individual with a disability to lead a fully integrated life.  Discrimination in the provision of other licenses – such as marriage licenses – can cause equally profound harms.

4.  Against that background of discrimination, Title II of the ADA is well tailored in this context – as in others – to protect against and remedy the improper license denials described above, and the accompanying violations of equal protection and due process rights, without infringing on public entities' legitimate prerogatives.  See *Coleman* v. *Court of Appeals of Maryland*, No. 10-1016, 2012

---

[12]  This report was one of two that Congress commissioned from the National Council on the Handicapped, an independent federal agency, in the years preceding the ADA's enactment.  See Rehabilitation Amendments of 1984, Pub. L. No. 98-221, Title I, § 141(a), 98 Stat. 17, 26-27; Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, Title V, § 502(b), 100 Stat. 1807, 1829.  The text of this report can be found online at http://www.ncd.gov/publications/1988/Jan1988.

WL 912951, at *4 ("Congress must tailor legislation enacted under §5 to remedy or prevent conduct transgressing the Fourteenth Amendment's substantive provisions.") (internal quotation marks omitted).  Accordingly, it is an "appropriate response to this history and pattern of unequal treatment."  *Lane*, 541 U.S. at 530.

In remedying the extensive history of public disability discrimination, Congress was not limited to barring actual constitutional violations.  It was entitled to "enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct."  *Nevada Dep't of Human Res.* v. *Hibbs*, 538 U.S. 721, 727-728 (2003).  In particular, Congress permissibly banned "practices that are discriminatory in effect, if not in intent," notwithstanding that the Equal Protection Clause bans only intentional discrimination.  *Lane*, 541 U.S. at 520.

What Congress may not do is pass legislation "which alters the meaning of" the constitutional rights purportedly enforced.  *City of Boerne* v. *Flores*, 521 U.S. 507, 519 (1997).  "[T]he line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies."  *Id.* at 519-520.  The ultimate question is whether there is "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  *Id.* at 520.  Put another way, "the

question is not *whether* Title II exceeds the boundaries of the Fourteenth

Amendment, but *by how much*."  *Constantine*, 411 F.3d at 490.

 Title II enforces not only the Equal Protection Clause, but also "a variety of

other basic constitutional guarantees, infringements of which are subject to more

searching judicial review" than rational basis.  *Lane*, 541 U.S. at 522-523.  It is a

"limited" remedy that is "reasonably targeted to a legitimate end" in the context of

licensing, just as *Lane* found it to be in the context of judicial services.  *Id.* at 531-

533.

 As applied to discrimination in the licensing context, Title II's requirements

serve a number of important and valid prophylactic and remedial functions.  The

statute requires a number of concrete actions by States that directly protect due

process rights.  In this context, Title II requires, for example, that public entities

provide (1) interpreters for the hearing impaired; (2) assistance for those whose

disabilities make it difficult to complete license applications; and (3) physical

access to government buildings that administer licensing programs.  See, *e.g.*, 42

U.S.C. 12131(2) & 12132; 28 C.F.R. 35.130, 35.150, 35.160, 35.161.  These

requirements ensure that persons with disabilities are afforded a "meaningful

opportunity to be heard," *Lane*, 541 U.S. at 532 (citation omitted), before being

denied licenses.

- 38 -

Title II also prevents violations of equal protection in this context.  Not only
does it directly bar overt discrimination, but its requirements serve to detect and
prevent difficult-to-uncover discrimination that could otherwise evade judicial
review.  See 42 U.S.C. 12101(a)(5) (describing "various forms of discrimination,"
including but not limited to "outright intentional exclusion," to which individuals
with disabilities are subject).  When public officials make discretionary decisions,
as they often must do in this context, there is a real risk that those decisions will be
based on unspoken, irrational assumptions, leading to "subtle discrimination that
may be difficult to detect on a case-by-case basis." *Hibbs*, 538 U.S. at 736.  By
prohibiting insubstantial reasons for denying licenses to persons with disabilities,
Title II prevents covert discrimination against disabled applicants.

Furthermore, a "proper remedy for an unconstitutional exclusion" does not
simply "bar like discrimination in the future," but also "aims to eliminate so far as
possible the discriminatory effects of the past." *United States* v. *Virginia*, 518 U.S.
515, 547 (1996) (citation and alterations omitted).  A simple ban on overt
discrimination would have frozen in place the effects of States' prior official
exclusion and isolation of individuals with disabilities, under which persons with
disabilities were invisible to government officials and planners, resulting in
inaccessible buildings and impassable procedures.  In particular, it would have
done nothing regarding standards for licensing decisions that were set without

regard to whether they arbitrarily excluded qualified individuals with disabilities.

Removing barriers to integration caused by past discrimination is an important part

of accomplishing Title II's goal of reducing stereotypes and misconceptions that

risk constitutional violations throughout government services.

That Title II requires States to take certain actions that the Constitution itself

might not compel does not make it a disproportionate response.  Having identified

a constitutional problem, Congress was entitled to pass prophylactic legislation that

requires state agencies to reasonably accommodate individuals with disabilities in

general, not simply in those encounters in which a court would find a due process

or equal protection violation.  The Supreme Court upheld the family leave

provisions of the Family and Medical Leave Act as a valid exercise of Section Five

authority, notwithstanding that the FMLA – meant to remedy the long history of

employment discrimination against women – requires the "across-the-board"

provision of family leave to men and women alike.  See *Hibbs*, 538 U.S. at 737.

b.  Title II accomplishes these critical objectives while minimizing the

burden of compliance on States.  Title II prohibits only discrimination "by reason

of * * * disability," 42 U.S.C. 12132, and so States retain the discretion to exclude

persons from programs, services, or benefits for any lawful reason unrelated to

disability.  Moreover, Title II "does not require States to employ any and all

means" to make licenses and other public services accessible for people with

disabilities, but rather requires only certain "'reasonable modifications' that would not fundamentally alter the nature of the service provided." *Lane*, 541 U.S. at 531-532 (quoting 42 U.S.C. 12132(2)). Public entities need not "compromise their essential eligibility criteria for public programs." *Lane*, 541 U.S. at 532; see 28 C.F.R. 104 (defining "[q]ualified individual with a disability" as individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, * * * meets the essential eligibility requirements"). Rather, they retain the power to set core eligibility standards, and an individual with a disability must meet such standards "before he or she can even invoke the nondiscrimination provisions of the statute." *Constantine*, 411 F.3d at 488.

In particular, a public entity need not issue a license to someone who would "pose[] a direct threat to the health or safety of others," 28 C.F.R. 35.139(a), as the defendants contend that plaintiff would if licensed to be a police officer. Title II simply requires that the "direct threat" inquiry be made even-handedly, without reliance on stereotypes about the capabilities of individuals with disabilities or requirements and procedures that unnecessarily exclude them. See, *e.g.*, *Doe* v. *County of Centre*, 242 F.3d 437, 449 (3d Cir. 2001) (finding that "analysis of the ADA's direct threat exception should involve an individualized inquiry into the significance of the threat posed").

Nor does Title II require States to "undertake measures that would impose an undue financial or administrative burden." *Lane*, 541 U.S. at 532; see *Olmstead* v. *L.C.*, 527 U.S. 581, 603-605 (1999) (describing limitations on State's responsibility); accord *Constantine*, 411 F.3d at 488-489.  For example, Title II requires adherence to certain architectural standards only for new construction and alterations, when facilities can be made accessible at little additional cost.  28 C.F.R. 35.151.  By contrast, a public entity need not engage in costly structural modification for older facilities if it can make services accessible in other ways, such as by "relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Lane*, 541 U.S. at 532.  These important limitations on the scope of Title II "tend to ensure Congress' means are proportionate to ends legitimate under § 5." *Constantine*, 411 F.3d at 489 (quoting *City of Boerne*, 521 U.S. at 533).

5.  Finally, the validity of Title II's application to the licensing context must be viewed in light of the broader purpose and application of the statute.  Congress found that the discrimination faced by persons with disabilities was not limited to a few discrete areas, such as licensing.  To the contrary, Congress found that persons with disabilities have been subjected to systematic discrimination in a broad range of public services.  See 42 U.S.C. 12101(a)(3).  As harmful as discrimination is when felt in just one place, it is that much worse when it manifests in every part of

society.  Individuals with disabilities, Congress found, suffered from the "kind of

'class or caste' treatment that the Fourteenth Amendment was designed to

abolish."  *Plyler* v. *Doe*, 457 U.S. 202, 216 n.14 (1982).

Title II's application to licensing decisions, thus, is part of a broader remedy

to a constitutional problem that is greater than the sum of its parts.  It operates not

in isolation, but in conjunction with Title II's application to courthouses,

education, and all other public services and programs.  Before enacting Title II,

Congress compiled a voluminous record of official discrimination against

individuals with disabilities in virtually every public service or program

imaginable.  See *Lane*, 541 U.S. at 528 (noting "the sheer volume of evidence

demonstrating the nature and extent of unconstitutional discrimination against

persons with disabilities in the provision of public services").  In response to that

record, Congress required public entities to take reasonable measures in every

context to ensure that individuals with disabilities can be full participants.

Ending discrimination in one context is part of ending it in others, both by

putting a stop to irrational stereotypes and by laying the foundation for greater

participation by individuals with disabilities in other areas.  See *Association for

Disabled Ams., Inc.*, 405 F.3d at 959 ("Discrimination against disabled students in

education affects disabled students' future ability to exercise and participate in the

basic rights and responsibilities of citizenship, such as voting and participation in

public programs and services.").  In particular, non-discrimination in licensing

permits individuals with disabilities to live more independently, join the

workforce, and otherwise integrate into the larger community.  Cf. *Olmstead*, 527

U.S. at 600 (unnecessary segregation of individuals with disability is

discrimination, in part because it "perpetuates unwarranted assumptions that

persons so isolated are incapable or unworthy of participating in community life").

Title II's application to licensing is just one part of a much larger project, which

itself is a proportional and congruent response to the myriad of constitutional

violations that it remedies.[13]

---

[13]  The Court in *Lane* did not examine the congruence and proportionality of
Title II as a whole because it found that the statute was valid Section Five
legislation as applied to the class of cases before it.  Similarly, because Title II is
valid Section Five legislation as applied to discrimination in licensing, this Court
need not consider the validity of Title II as a whole.  It remains the position of the
United States, however, that Title II as a whole is valid Section Five legislation
because it is congruent and proportional to Congress's goal of eliminating
discrimination on the basis of disability in the provision of public services – an
area that *Lane* determined is an "appropriate subject for prophylactic legislation."
*Lane*, 541 U.S. at 529.

## CONCLUSION

This Court should first address certain preliminary questions, the resolution of which may make it unnecessary to decide whether Title II of the ADA is valid legislation under Section Five of the Fourteenth Amendment.  Should it reach the question, this Court should find that Title II of the ADA is valid Section Five legislation and thus abrogates sovereign immunity in cases involving public licensing.

Respectfully submitted,

THOMAS E. PEREZ
  Assistant Attorney General

s/ Sasha Samberg-Champion
JESSICA DUNSAY SILVER
SASHA SAMBERG-CHAMPION
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, DC 20044-4403
  (202) 307-0714

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(a), I hereby certify that I am

exempt from the Third Circuit's bar admission requirement as counsel to the

United States.


<u>s/  Sasha Samberg-Champion</u>
SASHA SAMBERG-CHAMPION
  Attorney


Date: March 30, 2012

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Local Rule 31.1(c), I hereby certify that the foregoing Brief For The United States As Intervenor complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman, 14-point font.

I further certify that the foregoing Brief For The United States As Intervenor complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,270 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Pursuant to Local Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the paper copies of this brief.  I further certify that a virus detection program (TREND MICRO$^{TM}$ OfficeScan$^{TM}$ Version 8.0) has been run on the electronic brief, and that no viruses were detected.

s/ Sasha Samberg-Champion
SASHA SAMBERG-CHAMPION
 Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2012, I electronically filed the foregoing Brief For The United States As Intervenor with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  I also certify that on March 30, 2012, ten (10) paper copies, identical to the brief filed electronically, were sent to the Clerk of the Court via United States Certified Mail.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>s/Sasha Samberg-Champion</u>
SASHA SAMBERG-CHAMPION
 Attorney

# ADDENDUM

CA 37

votejust.2
votejust

A VOTE FOR JUSTICE.

I URGE THE CONGRESS TO ENACT, AND THE PRESIDENT TO SUPPORT AND TO SIGN, LEGISLATION SUCH AS THE AMERICANS WITH DISABILITIES ACT OF 1988, WHICH WILL EFFECTIVELY PROTECT ALL PERSONS WITH DISABILITIES AGAINST DISCRIMINATION ON THE BASIS OF HANDICAP.

I FURTHERMORE URGE THE ESTABLISHMENT OF THOSE BASIC SERVICES AND HUMAN SUPPORT SYSTEMS NECESSARY TO MAKE RIGHTS REAL IN EVERY DAY LIFE, AND WHICH WILL ENABLE ALL PEOPLE WITH DISABILITIES TO ACHIEVE THEIR FULL POTENTIAL FOR INDEPENDENCE, PRODUCTIVITY AND QUALITY OF LIFE IN THE MAINSTREAM OF SOCIETY.

I HAVE PERSONALLY EXPERIENCED AND/OR OBSERVED THE FOLLOWING DISCRIMINATION AGAINST PEOPLE WITH DISABILITIES:

California Basic Educational Skills Test discriminates against deaf adults who wish to become Teachers of the deaf. Many of these adults are excellent students, capable of earning a Master's degree from their University Training program. Many possess excellent communication skills and other qualities that will make them superior Teachers and role models for deaf students.

signed Joyce L Groode

address: Dept of Sp Ed Calif State University

tel: Northridge, CA 91330

Please support ADA.

1

CA 130
(see over)

votejust.2
votejust

A VOTE FOR JUSTICE.

I URGE THE CONGRESS TO ENACT, AND THE PRESIDENT TO SUPPORT AND TO
SIGN, LEGISLATION SUCH AS THE AMERICANS WITH DISABILITIES ACT OF
1988, WHICH WILL EFFECTIVELY PROTECT ALL PERSONS WITH
DISABILITIES AGAINST DISCRIMINATION ON THE BASIS OF HANDICAP.

I FURTHERMORE URGE THE ESTABLISHMENT OF THOSE BASIC SERVICES AND
HUMAN SUPPORT SYSTEMS NECESSARY TO MAKE RIGHTS REAL IN EVERY DAY
LIFE, AND WHICH WILL ENABLE ALL PEOPLE WITH DISABILITIES TO
ACHIEVE THEIR FULL POTENTIAL FOR INDEPENDENCE, PRODUCTIVITY AND
QUALITY OF LIFE IN THE MAINSTREAM OF SOCIETY.

I HAVE PERSONALLY EXPERIENCED AND/OR OBSERVED THE FOLLOWING
DISCRIMINATION AGAINST PEOPLE WITH DISABILITIES:

Thank you for coming to listen and to hear what
we have to say. I have had 2 gran mal seizures
in my 52 years 13 years apart. Those of us with
seizure disorders need your help. Doctors are required
to report patients with seizure disorders to the Dept.
of Motor Vehicles which results in the revocation of our
drivers licences for various periods of time. Doctors
are not required to report their patients who are
alcoholics or drug abusers, yet they have the potential
of erratic behavior behind the wheel of their cars
each and every day of their lives. They would have
far greater insurance liability than those who have
seizures. I have had 2 days of my life when I could
possibly have been a threat while driving. I say
possibly! Both times I have had ample warning to
over

signed _Stanley Warn_
STANLEY WARN
address: 11029 LAUREL LANE
GRASS VALLEY, CA. 95945

tel: 916-273-5261

2

...to let you know that I was having difficulty. This would have been plenty of time to stop and safely park my car and wait for help. It seems that laws are at times made because we do not understand a situation well enough. Perhaps even fear the situation. I appreciate you taking your time to understand.

Another area in which I have been affected is in health insurance. We have recently returned to California and need to get new health insurance. I have been flatly denied insurance because of the grand mal seizure. It has been 9 months since I had my second seizure and I have worked very hard to recover fully. Insurance companies have assigned risk policies for auto insurance - why not for temporarily disabling health problems? Had health insurance companies paid for preventive medical check-ups, my second seizure would never have happened. My Dylantin level was almost nonexistent. At the time of this second seizure. This would have been caught had insurance covered preventive care or I had enough money to pay for a complete annual check-up. It would have cost the insurance company far less than another hospital stay and therapy.

In closing, again thank you; it is my hope that you take the information you have learned and thoughtfully create legislation that will eliminate bias' through understanding and that you will

Star-Bulletin

# LETTERS   8/19/88

## Handicapped man angered by denial of driver's license

I am confused. In the Driver's Handbook it states that a person holding a valid out-of-state driver's license may need only to take the renewal test. So off I go to get my Hawaii driver's license, having studied the handbook cover to cover.

I drive to the testing station and wait in line with my wife who also wants to get her license. We get to the head of the line and I am asked for my license. The person behind the desk calls her superior over. The superior looks at the license puzzled.

"You have no restrictions on this license," she says.

"Well, the state of California probably forgot to list them," I say.

"Well, you will have to have a physical," she says. "By the way, you can get into and out of your car by yourself, can't you?"

"No, I can't, I'm a quadraplegic and I don't have the upper body strength to transfer," I said.

"Well, you can't have a Hawaii Driver's License because of DOT regulations," she says. We leave.

Now for the point of this letter: After driving 21 years in California, I have had two minor fender-benders and one moving violation (65 in a 55 zone). I feel that the licensing body is being discriminatory against people who have physical shortcomings like myself.

It is ironic that I came here from a state that is known for its tough driving regulations and poor rapid transit system, only to find that the only way I can drive a car here is to use my California driver's license. I can't use "TheBus" system because they are not equipped for the handicapped.

Come election time, I will have checked all the candidates' records to find where they stand on issues dealing with the handicapped. I encourage others who feel as I do to let your voices be heard at the ballot box.

*Edward Votaw*

00732

K4-26

Testimony of Nina Coyer (Deaf Consumer)

I want to thank-you for giving me an
opportunity to speak today.

I am a deaf teacher at Ky. School for
the deaf and a graduate of a state College in Ky.
I would like to see more deaf teachers teachin
deaf children. Unfortunately the state Law
here in Ky. has prevented it.

The state Law requires any Special Education
students to have dual education with
Regular Education. For intance, in Regular
Education, they are required to take music
education. How can deaf students take
music classes when they can't I comm    Fil
another requirement is to imp.
speech skills and ability to
This is discrimination.

Let me give you some of my experience
relating to Elementary Education Dept.
When I enrolled to be in both Ele. Ed.
and Deaf Ed., The Ele. Ed. hesitated to
accept me because of my deafness and
wondered if I could function to teach

5

00808

At this point in my life, I am married and have two children.
My neighbors, some family members and the general public may
observe us all together and say to themselves, "he does so
well for himself", but they are actually defining for
themselves what becomes ultimately expected when a person
with a disability becomes the partner of a non-disabled
person.  Role identity in the two working parent family is
difficult enough, and still needs support while being
defined, but with the addition of blindness, life in a family
becomes more complex.  I am forced to rely on patronizing
volunteers for reading, driving, shopping, doing the
paperwork for banking, form filling, keeping up with the ads,
news, etc, bicycling, swimming, or bringing my children out
without the company of my wife.  Others expect that my wife
will do all the voluntary tasks in addition to her job and
her own life interests.  The typical pattern develops over
time usually places these responsibilities on the spouse,
first as an obligation, second as a convenience and finally
out of lacking resources for alternatives.  Blind people need
a break too when it comes to personal support services,
particularly in the context of family life.  We need control
over our supports, a means to pay for services in order to
make them meaningful, and some dignity in knowing that we do
not have to rely on handouts.

 I will end with the most recent experience I am hopefully in
the process of resolving.  My wife is a day care provider in
our home.  It is essential for me to be licensed as her
assistant in order to free her up for short periods of time
to take the kids to the doctor and so on.  In processing my
application for licensure, I am being asked to qualify my
capabilities to supervise children because i am blind.  My
application material was satisfactory, as well as my
references.  My references mentioned my blindness in the
context of it not being a deficit in preforming the work as
required.  For all intents and purposes, I should be granted
a license.  I have explained all this to the office For
Children, and am awaiting their letter requesting more
information.  I will take this further if necessary and hoe
my statements regarding their need to determine eligibility
based on equal data will deter them from pursuing this matter
further.

6

Case 2:09-cv-00442-TFM   Document 73-1   Filed 09/10/12   Page 63 of 73

00950

# MY EPILEPSY EXPERIENCE
by The Reverend Charles H. Swinehart, Jr.



## 50's EPILEPSY SURFACES

Upon graduation from high school in the late 50's, I had decided to become an Episcopal Minister. I was about to begin the necessary college course of study when I had my first seizure. At that time I had no idea as to why this sudden event had happened nor what it might mean.

After a 3rd seizure, two years later, my parents and I decided it was time to seek medical advice. We learned that these unexplained events were really epileptic seizures. The physicians said I was likely to have further such seizures. The time and place of future seizures could not be predicted. Other than learning I had epilepsy, the summer passed without incident. I accepted the doctor's diagnosis and considered epilepsy just another aspect of my life. My parents were very understanding and supportive.

In the fall I returned to college in Tennessee and completed my education without further incident. During this time I never dreamed I might have special needs or interests because I had epilepsy. After all, almost everyone has problems of one kind or another. By taking my anti-convulsant medication regularly, I figured I could live the same as the next person.

I have generalized, tonic-clonic seizure, though I still refer to them as "grand mal." I am quite fortunate for although this type of seizure is "frightening to see" it is, perhaps, the most easily controlled with anti-convulsant medication. If all goes well and I pay attention to what lowers my seizure threshhold*, I average one seizure every couple years. My last seizure occurred in April of 1980. I have even gone as long as 7½ years between seizures.

Why was it that I developed epilepsy in the first place? I think Doctor William Svoboda's book *Learning About Epilepsy* gives a clue to my seizures on page 50, where the author says, "an ear infection may trigger a seizure or it may lead to meningitis, or a brain abscess which can result in seizures." As a child, I had a lot of ear infections and it may be that all those ear difficulties have made me somewhat *susceptible* to having seizures. I like to use the word "may" because it is hard to say why epilepsy surfaces. Only a year ago I believed I was living proof of the statement "people sometimes develop epilepsy for no reason." However, after researching available literature extensively, I think the ear difficulties I had as a child probably had something to do with my seizures.

## 60's THE DRIVER'S LICENSE INCIDENT

In the early 60's I met and courted a young lady from Nashville, Tennessee whom I was later to marry. At first I did not say anything to Carol or her family about my epilepsy. I was afraid of the possible difficulties involved in sharing such information. However, when I did tell them the news, they were very understanding.

My first introduction to the consequences of having epilepsy occurred in the fall of 1966. I had completed my ministerial studies at Virginia Theological Seminary. Ordination to the priesthood followed and I was charged with serving two small churches in a remote county in Michigan's Upper Peninsula. There was no public transportation and I was the only Episcopal Priest in the coun-

ty. Due to unforeseen circumstances, I had not taken my anti-convulsant medication for two days and I had a seizure. At that time Michigan had a "policy" of denying a driver's license to *anyone* who had had a seizure during the past year. I was denied a renewal of my driver's license although I had not been driving when I had had the seizure. My father, a practicing attorney at the time, took the matter to the local circuit court and won back my right to drive legally.

The official "policy" of having to be seizure-free for one year to be licensed to drive strikes me as being unjust. I believe a 90 day seizure-free period would be more reasonable. If this were the case, I think people would be more willing to report their seizures. To the best of my knowledge the State of Kentucky has had few, if any, difficulties following the adoption of just such a three-month seizure-free period.

## 70's THE FILM

During the 70's I became acquainted with the Epilepsy Center of Michigan and had the good fortune to speak at one of their annual Membership Meetings. I participated in local epilepsy efforts, both when living in Michigan's Upper Peninsula and later after we moved to the Lower Peninsula.

In 1978 I was invited to appear in a film called *People Who Have Epilepsy.* Fifteen people with epilepsy from all walks of life and from various parts of the country were brought together in New York City. Probably I was invited because few professionals are willing to talk publicly about their epilepsy. My participation helped provide a balance to the production. The film could be termed an unrehearsed *rap session.* We talked about how we coped with jobs, schools, travel, marriage, driving and other practical aspects.

The film was my first opportunity to sit and talk at length with other people who have epilepsy. It helped to learn what others had found worked in their own lives. A certain "freedom" and "release" could be felt as we talked openly and frankly about subjects we had long kept to ourselves. At first most of us were reluctant to share in depth, but such hesitation soon vanished.

Later I was encouraged that others found the film useful. For example, the Executive Director of the Idaho Epilepsy League pointed out that *"People Who Have Epilepsy"* is an invaluable aid to public education and awareness campaigns and in training professionals who work in the field of epilepsy.

The following year the possibility was raised of beginning some type of church work for people with epilepsy. This would unite both of my interests: epilepsy and the church. As I thought about the possibilities, I realized that such a work might well be the best way I could serve God and my fellow man. Also, I could share what I had learned. Hopefully, such a project would help more people with epilepsy realize that God and the Church love and accept them.

For me, however, the big question was whether I would

Continued on page 4



01170

votejust.2
votejust

A VOTE FOR JUSTICE.

I URGE THE CONGRESS TO ENACT, AND THE PRESIDENT TO SUPPORT AND TO
SIGN, LEGISLATION SUCH AS THE AMERICANS WITH DISABILITIES ACT OF
1988, WHICH WILL EFFECTIVELY PROTECT ALL PERSONS WITH
DISABILITIES AGAINST DISCRIMINATION ON THE BASIS OF HANDICAP.

I FURTHERMORE URGE THE ESTABLISHMENT OF THOSE BASIC SERVICES AND
HUMAN SUPPORT SYSTEMS NECESSARY TO MAKE RIGHTS REAL IN EVERY DAY
LIFE, AND WHICH WILL ENABLE ALL PEOPLE WITH DISABILITIES TO
ACHIEVE THEIR FULL POTENTIAL FOR INDEPENDENCE, PRODUCTIVITY AND
QUALITY OF LIFE IN THE MAINSTREAM OF SOCIETY.

I HAVE PERSONALLY EXPERIENCED AND/OR OBSERVED THE FOLLOWING
DISCRIMINATION AGAINST PEOPLE WITH DISABILITIES:

Individuals I have worked with at Options have
been forced to live in segregated 202 Housing
projects instead of integrated community apartments that
are much less cost to the government. There are
other individuals that are denied medical service
because of only having Medical Assistance, denied jobs
because of their disability, not provided adequate
information in order to obtain benefits, cut
off Social Security for making only $600.00, denied
money assistance for modification to a vehicle
in order to acquire transportation, denied access to
take a drivers license exam because it was down
a flight of stairs, denied appropriate equipment to
help them live independently because of the type
of third party payers they have.

signed _____ Jay Johnson _____ - Executive Director
address Options - Interstate Resource Center for Independent Living
Holiday Mall - 211 DeMers Ave
tel: East Grand Forks MN 56721

8

Jim Shreve      h (216) 356-1719
19875 Eldora    ~ (216) 432-3921
Rocky River, Ohio
        44116

        When I was 16 yrs old I was refused a driver's
license in the State of Ohio - even though I was legally
eligible for one with 20/60 vision in one eye (which
I didn't know at that time) - without recourse to
info about what I could need or referral to
opthmologist, etc. This drastically altered my life
and I feel contributed to my condition of alcoholism.
    I became sober in 1982 - shortly after finally
getting my driver's license (through my own
advocacy) at age 28. To this date in Ohio
people are tested by insensitive, non-medical
personnel at driver's bureaus in front of
a room full of people (which is very
embarrassing). Simple medical (i.e. opthalgium)
statements are not taken in evidence.
        This insensitive treatment extends to
deaf and mentally limited people as well
who should be tested on their read performance

9



Austin, Texas 7874█

To whom it may concern:

This letter is written to express my opinion concerning a section of the required EXCET test for Texas teachers. Particularly I am concerned with a requirement for educators who are themselves deaf to pass a section of the test on speech assessment and listening. It has been a long and difficult struggle for me to obtain an education and the qualifications to be a teacher of deaf children. I have been successful in obtaining the required degree, and my goal when I went back to school in the fall of 1984 was to come back to Texas and teach. Now I am once again struggling to meet what I believe is an unfair requirement.

My greatest difficulty with the EXCET test was in being asked to answer questions which were unrelated and irrelevant to my position and training. I had had no courses to prepare me to answer questions relating to a Speech Therapist's job. I was not trained in this area. Since I am deaf, I do not have the ability to hear a child's speech problem; therefore, I can not attempt to assess and diagnose a speech problem. In obtaining my Master's Degree to teach the multihandicapped hearing impaired, I took a course titled "Teaching Aural and Oral". This had nothing to do with Speech Assessment.

It is my feeling that the requirement by TEA that I should be tested on speech and listening skills is an inequitable requirement and should be waived since I do not plan to teach in either of these two areas. One would not give a blind person an EXCET test asking a blind person to assess and diagnose a blind child's vision. Therefore, a deaf person should not be asked to assess and diagnose the ability of a speech or listening impairment in a hearing impaired child.

It is very discouraging to me when I encounter an obstacle such as the Texas EXCET test which blocks me from my goal to educate deaf children. According to my understanding, TEA wants qualified deaf teachers to work with deaf children and to be role models. It would be very encouraging to know that this is true. In this way bright deaf students could more easily aspire to higher educational training by following an example.

I do not argue that speech and hearing assessments are unnecessary. My argument is that hearing persons must conduct these, and only those persons should be tested for expertise in these areas by the EXCET test. My area of expertise is in teaching children ASL communication skills, translating this language into English for communication, and teaching them to overcome their hearing handicaps to be productive members of society.

[ Texas Education Agency ]

10

01513

MY NAME IS J. D. RADER.  I RESIDE AT 1909 DENFIELD DRIVE IN ROUND ROCK, TEXAS.  I GUESS I'M PRETTY AVERAGE - I'M MARRIED, DRIVE 24 MILES A DAY INTO AUSTIN WHERE I AM EMPLOYED AT HART GRAPHICS AS A PURCHASING AGENT.  MY WIFE AND I GO TO CHURCH, PAY TAXES - A LOT OF TAXES - SERVE AS ELECTION JUDGES AND PARTICIPATE IN SEVERAL CIVIC FUNCTIONS.  AS I SAID, JUST AVERAGE.  THE DIFFERENCE IS I'VE WORKED VER HARD TO BECOME "JUST AVERAGE".

AS YOU CAN SEE, I HAVE A PHYSICAL HANDICAP.  I ALSO HAVE A MORE DIFFICULT OBSTACLE TO OVERCOME:  PEOPLE'S PREJUDICE.  IN ORDER TO PREPARE MYSELF FOR THE JOB MARKET, I WENT TO THE UNIVERSITY.  I HOLD TWO B.A.'S AND ONE M.A.  OVER THE YEARS, I'VE GONE BACK TO SCHOOL TO UPDATE MY SKILLS IN THINGS LIKE COMPUTER SCIENCE.  I AM PRESENTLY STUDYING FOR MY LAST EXAMS TO QUALIFY AS A CERTIFIED PURCHASING MANAGER.  I'M ALSO A LICENSED REAL ESTATE BROKER.

IN ORDER TO PROVE MY PHYSICAL ABILITY BOTH TO MYSELF AND TO OTHERS, I'VE COMPETED IN THE SPORT OF METALLIC SILHOUETTE HANDGUNNING. MY WALL IS FULL OF TROPHIES TO REMIND ME OF THE DAYS I PITTED MY PHYSICAL SKILL AGAINST ALL COMEPS AND WON.  I'VE BACKPACKED EXTENSIVELY IN THE WESTERN UNITED STATES AND IN CANADA WHERE I HAVE BEEN 4 OR 5 DAYS AWAY FROM ANY OUTSIDE HELP AND HAVE SURVIVED WITHOUT SUCH HELP.

AND SO I RESENT THE HELL OUT OF ANY ONE WHO IMPUNES MY ABILITY TO BE AVERAGE.  THAT'S EXACTLY WHAT THE TEXAS DEPARTMENT OF PUBLIC SAFETY DID A FEW MONTHS AGO.

11

WHEN I RECENTLY APPEARED TO RENEW MY TEXAS DRIVERS LICENSE, I WAS DENIED THAT LICENSE UNTIL I TOOK A DAY OFF WORK, WAS EXAMINED BY A PHYSICIAN AT MY EXPENSE, AND WAS JUDGED BY A MEDICAL BOARD AS CAPABLE, BOTH MENTALLY AND PHYSICALLY, OF DRIVING A CAR. ALL THIS BECAUSE I AM HANDICAPPED AND IN SPITE OF A TWENTY-ODD YEAR RECORD OF DRIVING WITHOUT ANY ACCIDENTS OR TRAFFIC TICKETS. AND THIS IS THE SECOND TIME IN THAT DRIVING CAREER I'VE BEEN FORCED TO UNDERGO RE-TESTING.

THE 60TH LEGISLATURE, IN 1967, PASSED "REFORMS" OF THE DRIVERS LICENSING SYSTEM WHICH SET UP A MEDICAL ADVISORY BOARD TO "EVALUATE APPLICANTS AND/OR DRIVERS WITH MEDICAL IMPAIRMENTS" AND PASS ON THEIR ABILITY TO DRIVE. THE LAW GIVES THE MEDICAL ADVISORY BOARD AUTHORITY TO JUDGE TEN BASIC CATEGORIES OF PEOPLE:

1. CARDIO-VASCULAR-HEART, HIGH BLOOD PRESSURE

2. METABOLIC - DIABETES (HIGH AND LOW BLOOD SUGAR)

3. PSYCHIATRIC - MENTAL AILMENTS

4. NEUROLOGICAL - NERVOUS DISEASES, CONVULSIONS, SEIZURES,
   EPILEPSY AND PARKINSON'S DISEASE

5. GENERAL MEDICAL - GENERAL PHYSICAL CONDITION (THIS GETS
   ANYONE WITH ANY MEDICAL PROBLEM FROM DANDRUFF
   TO INGROWN TOENAILS)

6. ALCOHOL ABUSE - DEPENDENCE ON CONSUMPTION OF ALCOHOLIC BEVERAGES

7. MUSCULO-SKELETAL-MUSCLE DETERIORATION TO INCLUDE CEREBRAL
   PALSY, MUSCULAR DYSTROPHY AND ARTHRITIS

8. BLACK-OUTS - LOSS OF CONSCIOUSNESS (EXPLAINED OR UN-EXPLAINED)

9. DRUG ABUSE - ABUSE OF PRESCRIBED AND USE OF ILLEGAL DRUGS

10. VISION - SELF EXPLANAT $(12_y$

**ADVOCACY,**
**INCORPORATED**

*Advocating the Legal Rights of Texans with Developmental Disabilities*
*Implementing the Client·Assistance Program for Rehabilitation Clients*
*Advocating the Legal Rights of Texans with Mental Illness*

Catherine Dayle Bebee
EXECUTIVE DIRECTOR

Hello, my name is Judith Sokolow. I am the Director of the Client Assistance Program (CAP) at Advocacy, Inc. Advocacy, Inc. is a private, non-profit corporation which advocates for and protects the rights of people who have disabilities.

First of all, I'd like to say that I am very glad to be part of the effort to promote the Americans with Disabilities Act. This legislation holds the promise of eliminating the kinds of unethical and inhumane acts of discrimination on the basis of disability reported to us daily. The Americans with Disabilities Act extends the promise of equal access to employment, housing, transportation and, ultimately, all aspects of society that represent inclusion in the mainstream. Persons with disabilities deserve, and are entitled to, no less.

At the Client Assistance Program, we hear from Texans with disabilities struggling to overcome the barriers that stand in the way of full participation in this mainstream of American culture.

In the area of employment, we hear from persons with disabilities:

* who are not allowed interpreters or readers to assist in taking certification examinations for professional licenses;

* who do not get past an initial interview for a job because an employer learns of the presence of a disability and assumes the job applicant will have absenteeism or otherwise be unsuitable for employment. The job applicant then has the choice of lying or risking not getting hired;

* who cannot get into the building to perform a job or have a job interview due to architectural barriers;

* who are not provided appropriate training to develop job skills; or

* who, once they get the job, do not have access to the technological aids or accommodations that lead to successful employment.

In the area of housing, we hear from persons with disabilities:

* who can't find accessible, affordable housing;

7500 Shoal Creek Boulevard  Suite 171·E • Austin Texas 78757

**ADVOCACY,
INCORPORATED**

*Advocating the Legal Rights of Texans with Developmental Disabilitie*
*Implementing the Client Assistance Program for Rehabilitation Client*
*Advocating the Legal Rights of Texans with Mental Illnes*

Catherine Dayle Bebei
EXECUTIVE DIRECTO:

THANK YOU FOR THIS OPPORTUNITY TO CELEBRATE THE PASSAGE OF SECTION 504
OF THE REHABILITATION ACT WITH SO MANY CONSUMERS, ADVOCATES, PARENTS AND
FRIENDS WHO UNDERSTAND THE IMPORTANCE OF THAT ACT.  SECTION 504 HOLDS OUT
THE PROMISE OF EQUALITY IN EMPLOYMENT FOR PERSONS WITH DISABILITIES, AND WE
HAVE COME A LONG WAY IN THIS REGARD.  PEOPLE WITH DISABILITIES HAVE ENTERED
EVERY CAREER IMAGINABLE.  THEY HAVE DONE SO IN SPITE OF BARRIERS THROWN  IN
THE WAY  --  ARCHITECTURAL, PROCEDURAL, AND ATTITUDINAL BARRIERS  WHICH
ATTEMPT  TO  EXCLUDE PERSONS WITH DISABILITIES AS  THEY  STRIVE  FOR
INDEPENDENCE, SELF-EXPRESSION, AND THE RIGHT TO BE CONTRIBUTING CITIZENS.

AT THE CLIENT ASSISTANCE PROGRAM WE HEAR FROM PERSONS  WITH  DISABILI-
TIES CAUGHT BY THE BARRIERS THIS ACT WAS INTENDED TO ELIMINATE.  MANY PER-
SONS WITH DISABILITIES ARE BARRED FROM ENTERING THE CAREERS OF THEIR CHOICE
BY ARCHITECTURAL BARRIERS WHICH PROHIBIT THEM FROM PARTICIPATING FULLY  IN
EDUCATIONAL AND TRAINING PROGRAMS, BY PROCEDURAL  BARRIERS  WHICH DO  NOT
PROVIDE ACCOMMODATIONS FOR PERSONS WITH DISABILITIES WHO MUST COMPLETE
APPLICATION FORMS AND TAKE EXAMS TO ENTER EMPLOYMENT, AND, BY THE MOST
DESTRUCTIVE OF ALL, ATTITUDINAL BARRIERS WHICH REINFORCE OLD MYTHS AND
INCREDIBLY LOW EXPECTATIONS OF PERSONS WITH DISABILITIES; ATTITUDES  WHICH
PERMEATE ALL LEVELS OF THE COMMUNITY AND ATTEMPT TO KEEP PERSONS WITH  DIS-
ABILITIES IN ISOLATED, DEPENDENT, POSITIONS, WITHOUT ACCESS, WITHOUT
SKILLS, AND WITHOUT HOPE.  SOME OF THE MORE FRUSTRATING EXAMPLES OF  THESE
BARRIERS WHICH HAVE COME TO OUR ATTENTION AT CAP ARE:

- A MAN WHO IS DEAF WHO  SUCCESSFULLY  COMPLETED  COSMETOLOGY
  TRAINING, PURCHASED BY THE TEXAS REHABILITATION COMMISSION,
  WHO WAS NOT PERMITTED TO TAKE THE STATE COSMETOLOGY EXAMIN-
  ATION WITH AN APPROPRIATE INTERPRETER.

- A MAN WHO HAS EPILEPSY WHO WAS DISCHARGED FROM HIS JOB WHEN HIS EMPLOYER LEARNED HE HAS SEIZURES, EVEN THOUGH HE NEVER HAD A SEIZURE AT WORK.

- A WOMAN WHO HAS A VISION IMPAIRMENT WHO WAS NOT HIRED FOR A JOB BECAUSE THE EMPLOYER DETERMINED THAT HER VISION WOULD JEOPARDIZE HER SAFETY.

- A MAN WHO IS BLIND WHO WAS NOT ALLOWED TO TAKE THE STATE CHIROPRACTIC BOARD EXAM BECAUSE HE WAS UNABLE TO READ X-RAYS ALONE.

- A PERSON WHO IS DEAF WHO WAS TERMINATED FROM HIS JOB AT THE POST OFFICE AFTER A "TRIAL WORK PERIOD" WHO FEELS HE WAS HIRED FOR QUOTA PURPOSES ONLY.

THESE EXAMPLES ARE A SMALL PORTION OF THE SITUATIONS WE HEAR ABOUT DAILY. THEY ARE EXAMPLES OF BARRIERS THAT CAN BE OVERCOME EASILY IF REA-SONABLE, AND IN MOST CASES, SIMPLE ACCOMMODATIONS ARE MADE.

ALTHOUGH UNFAIR HIRING PRACTICES ABOUND, CAP IS PROHIBITED FROM TAKING ACTION ON ANY 504 COMPLAINT THAT IS NOT SPECIFICALLY AGAINST A PROGRAM OR BENEFIT UNDER THE REHABILITATION ACT. WE BELIEVE THAT CAP SHOULD BE ALLOWED TO PURSUE 504 COMPLAINTS FOR ANY INDIVIDUAL WHO IS UNABLE TO COMPLETE A REHABILITATION PROGRAM BY ENTERING APPROPRIATE WORK DUE TO EMPLOYMENT DISCRIMINATION ON THE BASIS OF A DISABILITY. CLIENT ASSISTANCE PROGRAMS COULD DO MUCH TO FURTHER SUCCESSFUL REHABILITATIONS BY BEING GIVEN THE OPPORTUNITY TO FURTHER THE INTENT OF 504.

IN CLOSING, I WOULD LIKE TO ADD THAT THE POWER OF THE DISABILITY MOVEMENT FLOWS FROM KNOWLEDGE...THE KNOWLEDGE THAT ACCOMMODATIONS CAN BE MADE...THAT PERSONS WITH DISABILITIES CAN WORK PRODUCTIVELY...THAT ALL PERSONS ARE ENTITLED TO EQUAL ACCESS AND FAIR EMPLOYMENT OPPORTUNITIES. THE DISABILITY MOVEMENT AND SECTION 504 ARE LINKED IN SIGNIFICANT WAYS. 504 CAN OPEN DOORS TO EMPLOYMENT FOR PERSONS WHO HAVE DISABILITIES. AS

15

**ADVOCACY, INCORPORATED**

*Advocating the Legal Rights of Texans with Developmental Disabilities
Implementing the Client Assistance Program for Rehabilitation Clients
Advocating the Legal Rights of Texans with Mental Illness*

September 19, 1988

Mr. Justin Dart
907 6th St., S.W., Apt. 516C
Washington, DC 20024

Dear Justin:

I am writing this letter on behalf of Cynthia Cunningham. She requested that I send you information concerning her present plight. Ms. Cunningham, as well as many other prelingually deaf educators in Texas, has been discriminated against by the **Texas State Teacher Competency Examination** for teachers of the deaf. However unintentional this may have been, we are finding that deaf instructors in this state are unable to pass the competency test which focuses heavily on speech and language assessment and the ability to teach listening skills, as well as speech.

In the case of Ms. Cunningham, she has a Masters Degree in Education of the Multi-Handicapped Deaf. Prior to her being dismissed from her job as a teacher for multi-handicapped deaf children at the Texas School for the Deaf in Austin, she had been a classroom teacher working only with multi-handicapped deaf. Her job description did not include the teaching of speech or listening skills. She, in fact, has a very good employment record with that school district; however, because of state law which mandates that each teacher pass the competency test which ideally was developed to measure competency skills needed in the field. She has lost her job because she could not pass this test.

At her request, I am sending you information which highlights the frustration Ms. Cunningham has experienced. Please keep in mind that she is not alone as there are other deaf instructors in the state who have been unable to pass the teacher competency test for the hearing impaired. It appears, at this time, that the Texas Education Agency is making no accommodations for these instructors, even though they were in otherwise good standing with their local school districts.

Sincerely,

*Michael L. Collier*
Michael L. Collier
Rehabilitation Specialist

MLC:jm
cc: Cynthia Cunningham
Attachments

7800 Shoal Creek Boulevard, Suite 171-E • Austin, Texas 78757
512/454-4816 • Voice or TDD
Toll Free • 1/800 252-9108 (Special Education Calls) • 1/800 223-4206 (All Other Calls) • Voice or TDD

PARLO FOLCENHOVEN

01786 95

I AM in suppoRt of AmcRicaNs with
Disabilities Act.

I was unAble to get a maRRiAge License
because the County Courthouse was Not
Accessible to someone in A wheelchAiR

- mANy yeaRs after my request the courthouse
was mADE Accessable.

---

Linda Koldenhaven - I suggest ADA
I have numerous allergies & find that, when I'm in room filled
with cigarette smoke, I must leave or suffer severe
headaches & sinus problems. Discrimination against the
handicapped isn't limited to a lack of wheelchair
ramps or interpreters for the deaf — Those with
respiratory disorders or allergies are often denied access
to places because of the prevalence of smoke.